Proposed Hearing Date and Time for Hearing on Approval of Bidding Procedures: 1/30/09 at 10:00 a.m. (prevailing Eastern Time)
Proposed Objection Deadline: for Approval of Bidding Procedures 1/28/09 at 4:30 p.m. (prevailing Eastern Time)

Proposed Hearing Date and Time for Hearing on Approval of Sale: 3/13/09 at 10:00 a.m. (prevailing Eastern Time)
Proposed Objection Deadline for Approval of Sale: 3/06/09 at 4:30 p.m. (prevailing Eastern Time)

Peter S. Partee
Scott H. Bernstein
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

-and-

Michael G. Wilson (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

*Proposed Attorneys for Debtors
 and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| U.S. ENERGY SYSTEMS, INC., *et al.*, | Case No. 08-10054 (RDD) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE U.S. ENERGY BIOGAS CORP. DEBTORS AND DEBTORS-IN-POSSESSION FOR (I) ENTRY OF AN ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS; (B) APPROVING BIDDING AND AUCTION PROCEDURES; (C) APPROVING BID PROTECTION TO THE STALKING HORSE BIDDER; (D) SETTING A DATE AND TIME FOR A HEARING TO APPROVE THE SALE RESULTING FROM AUCTION; (E) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (F) GRANTING RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE USEB DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSET PURCHASE AGREEMENT; AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

U.S. Energy Biogas Corp. ("USEB"), Biogas Financial Corp., Power Generation (Suffolk), Inc., Resources Generating Systems, Inc., Suffolk Biogas, Inc., USEB Assignee, LLC, ZFC Energy, Inc., ZMG Inc., and Oceanside Energy, Inc. (collectively, the "USEB Debtors"), each a debtor and debtor-in-possession in the above-captioned cases, by and through their undersigned counsel, hereby move (the "Motion") this Court for entry of an order (the "Bidding Procedures Order") (A) authorizing and scheduling an auction (the "Auction") for the sale of substantially all of the assets of the USEB Debtors (the "Biogas Assets"), free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Encumbrances"), except to the extent identified in the Successful Bidder's asset purchase agreement; (B) approving bidding and auction procedures (the "Bidding Procedures") in connection with the Auction; (C) approving the proposed bid protection to Silver Point Finance, LLC ("Silver Point" or the "Stalking Horse Bidder") in accordance with that certain Asset Purchase Agreement ("Asset Purchase Agreement"), dated January 23, 2009, by and among the USEB Debtors and Silver Point in substantially the form annexed hereto as **Exhibit A**; (D) setting a date and time for a sale hearing (the "Sale Hearing") to consider the sale (the "Sale") of the Biogas Assets; (E) establishing procedures for noticing and determining cure amounts; and (F) approving the termination of various non-debtor subsidiaries (the "Non-Debtor Subsidiaries") of the USEB Debtors.[1]  The USEB Debtors further move this Court for the entry of an order (the "Sale Order") (A) approving and authorizing the

---

[1]    Capitalized terms used herein, but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

sale of the Biogas Assets, free and clear of all Encumbrances except to the extent set forth in the Successful Bidder's asset purchase agreement; (B) authorizing and approving the Asset Purchase Agreement; (C) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (D) granting related relief. In support of the Motion, the USEB Debtors respectfully represent as follows:[2]

## I.    <u>General Background</u>

1.     On the date hereof (the "Petition Date"), each of the USEB Debtors filed their respective voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.     On January 9, 2008, U.S. Energy Systems, Inc., U.S. Energy Overseas Investments, LLC and GBGH, LLC (collectively, the "USEY Debtors," and together with the USEB Debtors, the "Debtors") filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court. The Chapter 11 cases of the USEY Debtors are pending in this Court before the Honorable Robert D. Drain.

3.     The USEB Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The USEB Debtors have, pursuant to a separate motion, moved this Court for an order authorizing the joint administration of their chapter 11 cases with the chapter 11 cases

---

[2]    Contemporaneously herewith, the USEB Debtors are filing an ex parte application respectfully requesting the entry of an order shortening time with respect to the hearing on the portion of this Motion seeking approval of the Bidding Procedures and shortening the objection deadline with respect to approval of the Bidding Procedures.

of the USEY Debtors.  No trustee, examiner or creditors' committee has been appointed in the

Debtors' chapter 11 cases.

4.      A full description of the USEB Debtors' business operations, corporate structures,

capital structure, and reasons for commencing these cases is set forth in full in the *Declaration of*

*Richard J. Augustine in Support of Chapter 11 Petitions and First Day Motions* (the "Augustine

Declaration").  Additional facts in support of the specific relief sought herein are set forth below.

## II.       Jurisdiction, Venue and Predicates for Relief

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and

Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the

Southern District of New York dated July 10, 1984 (Ward, Acting C.J.).  Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of

28 U.S.C. §157 (b)(2)(A),(N) and (O).

6.      The predicates for the relief requested herein are sections 105(a), 363 and 365 of

the Bankruptcy Code and Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

## III.       Specific Background

### A.       U.S. Energy Systems, Inc. and its Subsidiaries

7.      U.S Energy Systems, Inc. ("USEY") is a publicly-traded Delaware corporation.

Through its subsidiaries, USEY acquires and enhances high-potential energy assets, develops

clean, efficient energy sources, produces power, develops natural resources and provides energy

related services.  USEY acts as a holding company with two direct subsidiaries through which it

manages its two primary lines of business.  The first subsidiary, USEB is a Delaware

Corporation that indirectly owns 19 landfill gas to energy projects in the United States, 17 of

which produce electricity and 2 of which sell landfill gas as an alternative to natural gas.  The

other USEB Debtors are all direct or indirect subsidiaries of USEB. USEY's other subsidiary, U.S. Energy Overseas Investments, LLC ("USEO"), a Delaware limited liability company, owns a 79% interest in Debtor GBGH, LLC ("GBGH"), also a Delaware limited liability company. GBGH, in turn, owns a group of UK-based energy companies specializing in natural gas exploration, production and transportation and related power generation and services.

### B. The Prepetition Credit Facilities

8. On November 29, 2006, Debtor USEB and 31 of its subsidiaries (collectively, the "2006 Debtors") filed for protection under chapter 11 of the Bankruptcy Code in this Court to facilitate the restructuring of their capital structure. On May 24, 2007, the Court entered an Order confirming the *Joint Plan of Reorganization of U.S. Energy Biogas Corp. and its Affiliated Debtors* (the "2007 Plan"). The 2007 Plan became effective on May 31, 2007 and provided for payment in full of the allowed claims of creditors. On March 31, 2008, the Court entered a Final Decree and Order closing the chapter 11 cases of the 2006 Debtors.

9. In conjunction with the confirmation of the 2007 Plan, Debtor USEB entered into that certain Credit and Guaranty Agreement, dated as of May 31, 2007 (the "Credit and Guaranty Agreement"), by and among USEB, certain subsidiaries and affiliates of USEB, various lenders party thereto, and Silver Point, as administrative agent, collateral agent and lead arranger (the "USEB Agent"), and all other certificates, documents, instruments or agreements executed and delivered pursuant thereto (together with the Credit and Guaranty Agreement, the "USEB Credit Documents").

10. The proceeds of the Credit and Guaranty Agreement allowed the 2006 Debtors to exit bankruptcy and consummate the 2007 Plan. As of the date hereof, there is $83,800,000 in outstanding indebtedness (the "USEB Indebtedness") under the USEB Credit Documents, including all interest due and owing thereunder (at the contractual non-default rate) and all

unpaid fees and expenses related thereto. The amount of the USEB Indebtedness is subject to adjustment prior to the Closing in accordance with the terms of the USEB Credit Documents.

11. An agreement (the "NPI Agreement") related to the Credit and Guaranty Agreement entitles Silver Point to a portion of the net proceeds from any sale of the assets of the USEB Debtors that is consummated after February 28, 2008. That amount is in dispute, but the parties have agreed solely for the purposes of calculating the Purchase Price that the amount of indebtedness under the NPI Agreement is $5,800,000 (the "NPI Indebtedness"). The parties have agreed that the amount of the NPI Indebtedness is solely for purposes of calculating the Purchase Price and shall not constitute any admission or otherwise bind or prejudice Silver Point with respect to the calculation of the amount of the NPI Indebtedness for any other purpose, including without limitation for the purpose of determining the distribution of or Silver Point's entitlement to the purchase price paid for the Biogas Assets by a Successful Bidder (as defined below) other than Silver Point.

12. On August 7, 2006, Debtor GBGH completed the acquisition of certain energy assets in the United Kingdom through its wholly-owned subsidiary UK Energy Systems Limited, a non-debtor company qualified under the laws of England and Wales. This purchase was financed in part with the proceeds of that certain Credit and Guaranty Agreement (the "USEO Credit Agreement"), dated August 7, 2006, by and among Debtor USEO, as borrower, Debtors USEY and USEB, as guarantors, the lenders party thereto (the "USEO Lenders"), and Silver Point Finance, LLC as administrative and collateral agent (the "USEO Lien Agent"). Debtor USEO currently owes approximately $28.4 million, including post-petition interest (the "USEO Indebtedness") to the USEO Lenders, which amount is guaranteed by Debtor USEB, and is subject to adjustment prior to the Closing in accordance with the USEO Credit Agreement.

13.     In addition to the Credit and Guaranty Agreement, the USEB Debtors also entered into a number of security and intercreditor agreements related to the Credit and Guaranty Agreement, including the following: (i) that certain First Lien Security Agreement, dated May 31, 2007 (the "First Lien Security Agreement"), by and between the USEB Debtors, certain other guarantors and the USEB Agent; and (ii) that certain Collateral and Intercreditor Agreement (the "Intercreditor Agreement"; together with the First Lien Security Agreement, the "Security Agreements"), dated May 31, 2007, by and among USEB and the USEB Agent. Pursuant to the Security Agreements, the USEB Debtors, among other things, granted security interests in, and liens on, substantially all of their assets, including their cash (collectively, the "USEB Prepetition Collateral") as collateral security for their obligations under the USEB Credit Documents.

### C.     The Marketing Process

14.     Beginning in the summer of 2007, USEY decided to explore the possible recapitalization of USEY and its subsidiaries, including the sale of the USEB Debtors or substantially all of their assets. Jefferies & Company, Inc. ("Jefferies"), a prominent investment banking and financial advisory firm, was engaged to assist and advise USEY with respect to the recapitalization. Jefferies has advised USEY and the USEB Debtors with respect to contacting and negotiating with prospective purchasers for the sale of the USEB Debtors and their subsidiaries or their respective assets.

15.     In that capacity, Jefferies conducted a robust marketing process of the USEB Debtors' assets in late 2007 and early 2008. Of the thirty-six (36) investors that Jefferies contacted in the original marketing process, twelve (12) signed nondisclosure agreements and conducted more detailed diligence processes. Two interested parties submitted bids. After USEY filed for Chapter 11 protection, Jefferies and USEY held discussions with Silver Point and the two interested parties regarding their interest in being a stalking horse for the assets of

the USEB Debtors. Ultimately, Silver Point Finance, LLC agreed to act as the stalking horse bidder. The two interested parties that submitted bids during the original marketing process have expressed their intent to re-engage once the Bankruptcy Code section 363 sale process begins. Jefferies has also received interest from a number of additional parties and intends to conduct a thorough marketing process upon approval of the Sale Motion and Bidding Procedures.

16. After extensive marketing, the USEB Debtors determined that the offer presented by Silver Point represented the best and highest offer for the Biogas Assets. Accordingly, on January 23, 2009, the USEB Debtors and Silver Point entered into the Asset Purchase Agreement, whereby Silver Point has entered into a legally binding bid to acquire the Biogas Assets and, if deemed the Successful Bidder (as defined below) at the Auction, has agreed to purchase the Biogas Assets free and clear of Encumbrances, except to the extent set forth in the Asset Purchase Agreement.[3] Silver Point has agreed that its offer is subject to the USEB Debtors exercising their fiduciary duties to consider higher and otherwise better offers for the Biogas Assets. Accordingly, the USEB Debtors and Jefferies continue their efforts to market the Biogas Assets to parties that might be interested and qualified to make an offer. As a result of those efforts, the USEB Debtors submit that upon the conclusion of the Auction, the offer submitted by the Successful Bidder (as defined below) will constitute the highest or otherwise best offer for the Biogas Assets and will generate the maximum value for the benefit of the estates of the USEB Debtors and their respective creditors.

---

[3] In the Asset Purchase Agreement, Silver Point has agreed to assume the USEB Indebtedness, the NPI Indebtedness, a portion of the USEO Indebtedness, all of the allowed administrative expenses in the USEB Debtors' bankruptcy cases, all of the allowed administrative expenses in the USEY Debtors' bankruptcy cases (provided that such allowed administrative expenses in the USEB Debtors' bankruptcy cases and the USEY Debtors' bankruptcy cases shall in no event exceed $4.3 million in the aggregate), and all ordinary course liabilities of each of the USEB Debtors.

**D.  Termination of the Non-Debtor Subsidiaries**

17.     Debtor USEB has certain direct and indirect subsidiaries that no longer conduct operations.  In certain cases, the entities have no assets or known liabilities.  In other cases, the projects are no longer operating, but the entity owns scrap material at the project site and has an obligation to restore the site to its former condition.  Finally, some merely own equity in other subsidiaries, and their existence is no longer necessary.  These entities and their assets are excluded from the Asset Purchase Agreement and likely would be excluded from any asset purchase agreement because neither these entities nor their assets are needed for the Successful Bidder to continue the USEB Debtors' operations as of the Petition Date.

18.     The following entities are proposed to be dissolved and their existence terminated as soon as it is convenient to do so:  Biomass Energy Partners II, L.P. (100% owned by Debtors USEB and ZFC Energy); Biomass Energy Partners III, L.P. (100% owned by Debtors USEB and ZFC Energy and Biogas Financial Corp.); Biomass Energy Partners V, L.P. (100% owned by Debtors ZFC Energy and Biogas Financial Corp.); Brookhaven Energy Partners, LLC (100% owned by Debtor USEB); Broome Landfill Gas Associates, L.P. (99% owned by Debtor USEB and 1% by Zapco Broome Nanticoke Corp. (100% owned by Debtor USEY); Brown County Energy Associates, LLC (100% owned by Debtor USEB); Brown County Landfill Gas Associates, LP (100% owned by Debtor ZFC Energy and Brown County Energy Associates (100% owned by Debtor USEB)); Burlington Energy, Inc. (100% owned by Debtor USEB); Cape May Energy Associates, L.P. (100% owned by Debtors USEB and Resources Energy Systems, Inc. ("RES")); Cape May Landfill Gas Associates, L.P. (100% owned by Debtors USEB and ZFC Energy); Garland Energy Development, LLC (100% owned by Debtor USEB); Garland Landfil Gas Associates, L.P. (100% owned by Debtors USEB and ZFC Energy); Onondaga Energy Partners, L.P.  (100% owned by Debtors USEB and RES); Taylor Energy

Partners, L.P. (100% owned by Debtors ZFC and Biogas Financial Corp); Smithtown Energy Partners, L.P. (100% owned by Debtors USEB and RES); Springfield Energy Associates, Ltd. Partnership (100% owned by Debtors USEB and RES); Zapco Broome Nanticoke Corp. (100% owned by Debtor USEB); Zapco Energy Tactics Corp. (100% owned by Debtor USEB); ZMG Gasco, Inc. (100% owned by Debtor USEB); and ZFC Royalty Trust II, a common law trust that holds only an interest in an entity to be dissolved.

### E. The Asset Purchase Agreement

19.     A summary of the principal terms of the Asset Purchase Agreement, set forth in full in the Asset Purchase Agreement, is as follows:[4]

- **Sale Assets:** Except as otherwise provided in the Asset Purchase Agreement, all of the USEB Debtors' right, title and interest in the Biogas Assets shall be sold free and clear of all Encumbrances thereon and there against in accordance with section 363 of the Bankruptcy Code.

- **Purchase Price:** Pursuant to the Asset Purchase Agreement, the purchase price (the "Purchase Price" to be paid by Silver Point for the Biogas Assets shall be not less than $94,500,000, and shall be payable as follows: (a) the assumption of the entire amount of the outstanding USEB Indebtedness, which amount currently is $83,800,00, but is subject to adjustment prior to Closing in accordance with the terms of the USEB Indebtedness, (b) the assumption of the entire outstanding amount of the NPI Indebtedness, which amount shall be fixed solely for purposes of calculating the Purchase Price at $5,800,000, (c) the assumption or release of at least $500,000 of the USEO Indebtedness in accordance with the terms of the USEO Indebtedness, (d) cash in the amount of $100,000 payable by wire transfer of immediately available funds made to the account of U.S. Energy Systems, Inc. ("USEY") designated in writing by the Company on behalf of USEY to Silver Point at least two (2) business days prior to the Closing Date, (e) the assumption of the reasonable, documented administrative expenses of the USEB Debtors under Section 503(b)(1) of the Bankruptcy Code in the USEB Bankruptcy Case, regardless of whether incurred prior to or after the consummation of the transactions contemplated by the Asset Purchase Agreement (collectively, the

---

[4]     The following summary is qualified in its entirety by reference to the provisions of the Asset Purchase Agreement. In the event of any inconsistencies between the provisions of the Asset Purchase Agreement and the terms herein, the terms of the Asset Purchase Agreement shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Asset Purchase Agreement.

"USEB Administrative Expenses") plus reasonable, documented administrative expenses of USEY and the USEB Debtors under Section 503(b)(1) of the Bankruptcy Code in the USEY Bankruptcy Case (collectively, the "USEY Administrative Expenses" and together with the USEB Administrative Expenses, the "Administrative Expenses"), provided that in no event shall the Administrative Expenses assumed and payable by Silver Point hereunder exceed $4.3 million in the aggregate and (f) the assumption of the other Assumed Liabilities listed in the Agreement (such other Assumed Liabilities referred to herein as, the "Other Assumed Liabilities"). Included in the assumption by Silver Point of the USEB Debtors' known liabilities are USEB Debtors' ordinary course liabilities, including but not limited to trade payables, costs associated with curing contracts to be assumed in the USEB Debtors' bankruptcy cases, costs associated with rejecting contracts in the USEB Debtors' bankruptcy cases, costs arising under any assigned assets, all liabilities related to the employee benefit plans of the USEB Debtors, and all liabilities arising out of the employment or termination of employment of any the USEB Debtors' employees arising after the Closing Date.

- **Release**: At the Closing under the Asset Purchase Agreement, USEY and USEB each on their own behalf and on behalf of each of their successors, assigns, heirs, legatees and entities over which they, directly or indirectly, exercise control (collectively, the "Releasing Parties"), will irrevocably and unconditionally release, waive, and forever release and discharge Silver Point and the Acquired Companies (as defined in the Asset Purchase Agreement), and their respective shareholders, parent companies, subsidiaries, officers, directors, legal representatives, successors and assigns, and to the extent that any of the following may be responsible for any acts or omissions of any of the Acquired Companies, Silver Point and its affiliates and their shareholders, parent companies, subsidiaries, officers, directors, legal representatives, successors and assigns (collectively, the "Released Parties"), of and from any and all debts, demands, actions, causes of action, suits, proceedings, agreements, contracts, judgments, damages, accounts, reckonings, suits, proceedings, agreements, contacts, judgments, damages, account, reckonings, executions, claims and liabilities whatsoever of every name and nature, whether known or unknown, whether or not well founded in fact or in law, and whether in law or in equity or otherwise, whether direct or consequential, compensatory, exemplary, liquidated or unliquidated (collectively, the "Claims"), which any of the Releasing Parties ever had, now has, or which their respective legal representatives, successors, assigns, heirs, executors or administrators, can, shall or may have for or by reason of any matter, causes or anything whatsoever, from the beginning of the world to the date of the Release. This Release shall not apply to any Claim relating to the breach of such party of its obligations set forth in the Asset Purchase Agreement.

- Silver Point will similarly release the Releasing Parties and discharge USEB and its shareholders, officers, directors, parent companies, subsidiaries, legal representatives, successors and assigns, and, to the extent that any of the following may be responsible for any acts or omissions of any of the Selling Subs, USEB and its affiliates and their shareholders, officers, directors, parent

companies, subsidiaries, legal representatives, successors and assigns, of and from any and all debts, demands, actions, causes of action, suits, proceedings, agreements, contracts, judgments, damages, accounts, reckonings, executions, claims and liabilities whatsoever of every name and nature relating to (i) the NPI Indebtedness, (ii) the USEB Credit Documents, and (iii) the USEO Credit Agreement, whether known or unknown, whether or not well founded in fact or in law, and whether in law or in equity or otherwise, whether direct or consequential, compensatory, exemplary, liquidated or unliquidated (collectively, the "Claims"), which any of the Releasing Parties ever had, now has, or which their respective legal representatives, successors, assigns, heirs, executors or administrators can, shall or may have for or by reason of any matter, cause or anything whatsoever, from the beginning of the world to the date of the Release. This release shall not apply to (i) any Claim relating to the breach by such party of its obligations set forth in the Agreement and (ii) the obligations of USEB and its subsidiaries under the Agreement to be performed after the Closing.

- **Break-Up Fee:** If the USEB Debtors consummate a competing transaction with a person or an entity other than Silver Point, then the USEB Debtors shall pay to Silver Point an amount equal to $3,000,000.

- **Termination Events:** The Asset Purchase Agreement may be terminated upon any of the following events (a) by mutual written consent of both Silver Point and the Sellers; (b) by Silver Point if (i) Sellers have not initiated the bankruptcy cases of the USEB Debtors within two days of the date of the Effective Date; (ii) the Sellers have not filed the Sale Motion within five days of the Effective Date; (iii) the Bankruptcy Court has not entered the Bidding Procedures Order within nine days of the Effective Date, (iv) the Auction is not concluded on or before March 12, 2009, (v) the Bankruptcy Court has not entered the Sale Order by March 13, 2009, or (vi) the Closing Date has not occurred on or before June 30, 2009 (unless the failure to consummate is due to a material breach by Silver Point); (c) by either party if a Governmental Authority issues a ruling or an Order prohibiting the transactions contemplated hereby, which ruling or an Order is final and non-appealable; (d) by Silver Point in the event of any material breach by Seller or the Company of any of their respective agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of Seller or the Company to cure such breach within fourteen (14) days after receipt of the Purchaser Termination Notice; provided, however, that Silver Point (i) is not itself in material breach of any of its representations, warranties or covenants contained herein or in the Bidding Procedures Order or the Sale Order, (ii) notifies Seller in writing (the "Purchaser Termination Notice") of its intention to exercise its rights under the Asset Purchase Agreement as a result of the breach, and (iii) specifies in such Purchaser Termination Notice the representation, warranty or covenant contained herein or in the Bidding Procedures Order or the Sale Order of which Seller is allegedly in material breach; (e) by Seller in the event of any material breach by Silver Point of any of its agreements, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of Silver Point to cure such breach within fourteen (14) days after receipt of a Seller Termination Notice;

provided, however, that Seller (i) is not itself in material breach of any of its representations, warranties or covenants contained herein or in the Bidding Procedures Order or the Sale Order, (ii) notifies Silver Point in writing (the "Seller Termination Notice") of its intention to exercise its rights under the Asset Purchase Agreement as a result of the breach, and (iii) specifies in such Seller Termination Notice the representation, warranty or covenant contained herein or in the Bidding Procedures Order or the Sale Order of which Silver Point is allegedly in material breach; (f) by Silver Point, if Seller consummates another transaction or series of transactions in which (i) any capital stock or rights, options, warrants, convertible securities, subscription rights, conversion rights, exchange rights or other agreements or commitments of any kind that could require the Company or any of its Subsidiaries to issue or sell any shares of its capital stock (or securities convertible into or exchangeable for shares of its capital stock) is issued, sold, transferred or otherwise disposed of or otherwise transferred or (ii) a material portion of the Company's assets is sold, transferred or otherwise disposed of; or (g) by Silver Point, if Seller withdraws or seeks authority to withdraw its motion seeking approval of the transactions contemplated by the Asset Purchase Agreement, or announces any stand alone plan of reorganization or liquidation (or supports any such plan filed by any other party that is inconsistent with the transaction contemplated by the Asset Purchase Agreement).

- **Fees and Expenses**: The USEB Debtors are responsible for all legal, accounting, tax, consulting and financial advisory and other fees and expenses (other than Transfer Taxes) incurred by USEB Debtors in connection with the transactions contemplated by the Asset Purchase Agreement, subject to reimbursement as part of the Purchase Price.

The full terms and conditions governing the proposed Sale are set forth in the Asset Purchase Agreement. If there is any inconsistency between this Motion and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

20. Contemporaneously with the entering into the Asset Purchase Agreement, Silver Point entered into a side letter agreement (the "USEY Agreement") with USEY pursuant to which USEY is agreeing to (i) sell and convey to Silver Point USEY's interest in ZFC Royalty Partners, a Connecticut limited partnership, free and clear of all Encumbrances pursuant to section 363 of the Bankruptcy Code, (ii) assume and assign an environmental insurance policy to Silver Point pursuant to section 365 of the Bankruptcy Code, and (iii) execute and deliver to Silver Point a general release (collectively, the "USEY Assets"). In exchange for the USEY

Assets, Silver Point has agreed to pay directly to USEY cash in the amount of $100,000 (the "Release Consideration"). The sale of the Biogas Assets to Silver Point is contingent upon the Court's approval of the transactions contemplated by the USEY Agreement; provided, that such condition to the sale may be waived by Silver Point.

21. The Asset Purchase Agreement contains the following provisions, which the *Guidelines for the Conduct of Asset Sales*, adopted by this Court's General Order M-331, require to be separately disclosed:

- **Agreements with Management:** The obligation of Silver Point to effect the transactions contemplated in the Asset Purchase Agreement are subject to Richard J. Augustine, Steven Laliberty and Mary Lou Kachnowski having accepted offers of employment from Silver Point on the terms and conditions set forth in such offers. In light of the approval of the Asset Purchase Agreement by the board of the directors of Debtor USEY, these employment agreements are not believed to have any bearing on the fairness of the proposed sale and transaction set forth in the Asset Purchase Agreement.

- **Certain Deadlines Requiring Shortened Notice:** The Stalking Horse Bidder may terminate the Asset Purchase Agreement if: (i) if the Bankruptcy Court has not entered the Bidding Procedures Order within nine (9) days of the date on which the Asset Purchase Agreement was executed; (ii) the Auction is not concluded on or before March 12, 2009; or (iii) the Bankruptcy Court has not entered the Sale Order by March 13, 2009.

- **No Good Faith Deposit:** Silver Point is not required to provide a good faith deposit because it is the primary creditor of the USEB Debtors' estates.

- **Record Retention:** The Purchaser shall furnish or cause to be furnished to the USEB Debtors, upon request, as promptly as practicable, such information (including access to books and records) relating to the Acquired Companies and the Business as is reasonably requested for the administration of the USEB Debtors' bankruptcy cases.

- **Sale Free and Clear:** As described above, the sale of the Biogas Assets under the APA will be free and clear of Encumbrances and other interests, except to the extent provided for in the Asset Purchase Agreement. With respect to a sale of the Biogas Assets to a Qualified Bidder other than Silver Point, the Sale Order shall provide that the Biogas Assets are transferred free and clear of the USEB Credit Documents, the USEB Indebtedness, the NPI Agreement, the NPI Indebtedness, the USEO Credit Agreement and the USEO Indebtedness.

- **Use of Proceeds:** Upon the Closing of any Successful Bid to a Qualified Bidder other than Silver Point, the Successful Bidder shall provide for payment in cash in full at Closing of (i) the outstanding balance of the USEB Indebtedness, (ii) the $5.8 million NPI Indebtedness, (iii) the Administrative Expenses, and (iv) the Break-Up Fee. All remaining proceeds will be applied to pay down the USEO Indebtedness until it is paid in full.

22. The proposed Sale Order contains the following provisions, which the *Guidelines for the Conduct of Asset Sales*, adopted by this Court's General Order M-331, require to be separately disclosed:

- **Relief from Bankruptcy Rule 6004(h):** As described below, the USEB Debtors seek relief from the ten-day stay imposed by Bankruptcy Rule 6004(h).

- **Requested Findings as to Fraudulent Conveyance:** The USEB Debtors believe that the Purchase Price provided by Silver Point for the Biogas Assets constitutes reasonably equivalent value for the Biogas Assets under the Bankruptcy Code and other applicable law.

- **Requested Findings as to Successor Liability:** The USEB Debtors believe that there will be no substantial continuity between the USEB Debtors and Silver Point, there is no continuity of enterprise between the USEB Debtors and Silver Point, Silver Point is not a mere continuation of the USEB Debtors or the USEB Debtors' estates, and the Purchaser does not constitute a successor to the USEB Debtors or the USEB Debtors' estates.

23. The USEB Debtors have determined that a prompt Sale of the Biogas Assets is the only way to maximize the value of the Biogas Assets for their respective estates and creditors. By this Motion, the USEB Debtors seek to commence and consummate the sale process prior to the occurrence of any date specific Termination Events under the Asset Purchase Agreement. The USEB Debtors submit that many, if not most, of the parties that may have an interest in purchasing the Biogas Assets have already been contacted. Expediting the sale process will allow the USEB Debtors to capitalize on the interest previously expressed by some of the parties contacted and allow a consummation of the sale of the Biogas Assets prior to the occurrence of any date-specific Termination Events under the Asset Purchase Agreement. Moreover, the USEB Debtors submit that the prompt commencement of the sale process is the

best interests of the estates of the USEB Debtors and Debtor USEY because the consummation of the transactions contemplated by the Asset Purchase Agreement will result in the payment in full of the USEB Debtors' creditors and provide for the payment in full of administrative creditors in the USEY bankruptcy proceeding as well as distribution to USEY's unsecured creditors.

24.     Pursuant to the Asset Purchase Agreement, the USEB Debtors propose, among other things, to transfer, assign and sell the Biogas Assets to Silver Point. The Sale is subject to, among other things, (i) higher or otherwise better offers to be solicited pursuant to the form, manner and scope of the Bidding Procedures proposed in this Motion, and (ii) approval by this Court.

25.     By this Motion, the USEB Debtors seek entry of the Bidding Procedures Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, authorizing and approving the Bidding Procedures, including (i) conducting an auction of the Biogas Assets to be held on March 12, 2009 at 10:00 a.m. (prevailing Eastern Time); (ii) the Break-Up Fee (as defined below); (iii) the form and manner of the notice of the Auction and Sale Hearing and the form and manner of the publication notice of the Auction, a true and complete copy of each of the notice of the Auction and Sale Hearing and the publication notice of the Auction are respectively annexed hereto as **Exhibit C** and **Exhibit D**, in connection with the Asset Purchase Agreement; (iv) the form and manner of notice for determining cure amounts for the executory contracts and unexpired leases to be assumed and assigned (the "Cure Notice"), which is annexed hereto as **Exhibit E**; and (v) authorizing the acquisition and termination of the Non-Debtor Subsidiaries.

26.     Subject to the terms of the Bidding Procedures Order, at a hearing that the USEB Debtors request to be held on or about March 13, 2009 at 10:00 a.m. (prevailing Eastern Time),

the USEB Debtors request entry of an Order in the form annexed as **Exhibit F** (the "Sale Order") pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, authorizing and approving (i) the sale of the Biogas Assets, (ii) if a competing transaction is consummated, the allocation of a sufficient amount of the proceeds to repay the USEB Indebtedness, the NPI Indebtedness, a portion of the USEO Indebtedness (with the balance released by Silver Point), the USEB and USEY Administrative Fees (up to $4.3 million in the aggregate) and to pay the Break-Up Fee, and (iii) approving the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder.

## V.     Basis for Relief

### A.     The Proposed Bidding and Auction Procedures Should Be Approved

27.     The APA recognizes that the Sale is subject to Court approval and the receipt of higher or otherwise better offers.  In order to maximize the value of the Biogas Assets for the benefit of the chapter 11 estates of the USEB Debtors and their respective creditors, the USEB Debtors seek to implement a competitive bidding process for transactions of this size and nature and that is designed to generate a maximum recovery.

28.     The USEB Debtors propose that competing bids for the Biogas Assets be governed by the following Bidding Procedures:

**Bidding Process**:   The USEB Debtors and their advisors shall have the sole right to (i) determine whether any person who submits a bid for the Biogas Assets, in addition to Silver Point, is a Qualified Bidder (as defined below), (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence reviews, (iii) receive offers from Qualified Bidders, (iv) notice all parties with respect to the Bidding Procedures, and (v) evaluate and negotiate any offers made to purchase the Biogas Assets (collectively, the "Bidding Process").  Any person who wishes to participate in the Bidding Process must be a Qualified Bidder.  Neither the USEB Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder.  The USEB Debtors shall have the right to amend the Bidding Procedures in writing, which in no event shall be inconsistent with the

terms of the Asset Purchase Agreement or any Bankruptcy Court order, including the Bidding Procedures Order.[5]

**Participation Requirements:** Any person who wishes to participate in the Bidding Process (a "Potential Bidder") must become a "Qualified Bidder." As a prerequisite to becoming a Qualified Bidder (and thus, among other things, prior to being able to conduct due diligence), a Potential Bidder must deliver (unless previously delivered) to the USEB Debtors, not later than fourteen (14) days after entry of the Bidding Procedures Order on the Court's docket: (i) an executed confidentiality agreement in form and substance satisfactory to the USEB Debtors, and (ii) sufficient information, as requested by the USEB Debtors, to allow the USEB Debtors to determine that the bidder has the financial wherewithal to close the sale transaction, including but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the USEB Debtors) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder.

A Qualified Bidder is a Potential Bidder that delivers the documents described in subparagraphs (i) and (ii), and that the USEB Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by the USEB Debtors) to submit a bona fide offer and to be able to consummate a sale if selected as the Successful Bidder. No later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, the USEB Debtors shall determine, and shall notify the Potential Bidder, if such a Potential Bidder is a Qualified Bidder.

**Due Diligence:** The USEB Debtors may afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence on matters related to the Biogas Assets, including without limitation the Other Assumed Liabilities; provided, however, that the USEB Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined herein). The USEB Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the USEB Debtors nor any of their respective representatives are obligated to furnish any information to any person other than a Qualified Bidder. Each Qualified Bidder shall agree that it will not use any confidential information for any purpose other than submitting a bid.

**Bid Requirements:** Unless otherwise indicated below, all bids (unless such requirement is waived by the USEB Debtors) must include the following (the "Bid Requirements"):

- A cash purchase price, the value of which is determined by the USEB Debtors to be equal to or greater than the sum of (a) the Purchase Price set forth in the Asset Purchase Agreement, (b) the Break-Up Fee, and (c) $500,000; provided, however, that a bid may provide for the Qualified Bidder's assumption of the Other Assumed Liabilities.

---

[5] In the event of a dispute between the USEB Debtors and Silver Point as to the USEB Debtors' right to modify the Bidding Procedures, both parties shall have the right to seek a ruling from the Bankruptcy Court on an emergency basis with respect to such dispute.

- A letter stating that the bidder's offer is irrevocable until the earlier of (i) two (2) business days after the Biogas Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court, and (ii) forty-five (45) days after entry of an order of the Bankruptcy Court approving any sale transaction.

- An executed copy of a purchase agreement pursuant to which the Qualified Bidder proposes to acquire the Biogas Assets, which purchase agreement shall include a commitment to close by a date not later than June 30, 2009.

- An executed copy of a purchase agreement pursuant to which the Qualified Bidder proposes to acquire some or all of the USEY Assets in exchange for a cash payment to USEY in an amount at least equal to the amount of the Release Consideration.

- A $5 million good faith deposit (the "Good Faith Deposit").

- Written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the USEB Debtors with appropriate contact information for such financing sources.

- The identity of each entity that will be participating in such bid, including any proposed designee(s). Further, each bid must provide sufficient financial information and other information regarding both the Qualified Bidder and all other parties participating in the bid to satisfy the USEB Debtors with respect to the requirements enumerated in section 363(m) of the Bankruptcy Code or otherwise provided for herein.

- A blackline comparing the bidder's proposed purchase agreement against that of Silver Point.

A bid received from a Qualified Bidder that includes all of the Bid Requirements shall be a "Qualified Bid."

The USEB Debtors reserve the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest, best or otherwise financially superior offer.

**Bid Deadline**: To be considered a timely bid, a Qualified Bidder shall deliver the Required Bid Documents to (i) US Energy Systems, Inc., 40 Tower Lane, 1st Floor, Avon, Connecticut 06001 (Attn: Richard Augustine), (ii) Hunton & Williams LLP, 200 Park Avenue, New York, New York 10066-0091 (Attn: Peter S. Partee, Esq.), attorneys for the USEB Debtors, and (iii) Skadden, Arps, Slate, Meagher & Flom LLP, 333 W. Wacker Drive, #2100, Chicago, Illinois 60606 (Attn: L. Byron Vance, III, Esq.), attorneys for Silver Point, not later than 4:00 p.m. (prevailing Eastern Time) on March 9, 2009 (the "Bid Deadline").

**Silver Point Qualified Bidder/ Asset Purchase Agreement Qualified Bid:** Silver Point is a Qualified Bidder, and the Asset Purchase Agreement is a Qualified Bid. Silver Point's offer to purchase the Biogas Assets as set forth in the Asset Purchase Agreement is irrevocable until the earliest of (i) two (2) business days after the Biogas Assets have been sold pursuant to the closing of a sale approved by the Bankruptcy Court, (ii) forty-five (45) days after the entry of an

order of the Bankruptcy Court approving any sale transaction, or (iii) the Asset Purchase Agreement is validly terminated in accordance with its terms.

**Credit Bidding:** Silver Point as administrative agent, collateral agent, syndication agent, lead arranger and lender under the USEO Credit Agreement shall be entitled to credit bid the full amount of the USEO Indebtedness, the USEB Indebtedness, and the NPI Indebtedness.

**"As Is, Where Is":** The sale of the Biogas Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the USEB Debtors, their agents or their estates except to the extent set forth in the Asset Purchase Agreement or the purchase agreement of another Successful Bidder. The proposed purchaser and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Biogas Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Biogas Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Biogas Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the agreement of another Successful Bidder.

**Biogas Assets to be Sold Free of Any And All Encumbrances:** Except as otherwise provided in the Asset Purchase Agreement, all of the USEB Debtors' right, title and interest in and to the Biogas Assets subject thereto shall be sold free and clear of all liens, claims and encumbrances thereon and there against in accordance with section 363 of the Bankruptcy Code.

**Auction:** If more than one Qualified Bid has been received (in addition to the Asset Purchase Agreement), the USEB Debtors shall conduct the Auction with respect to the Biogas Assets. The Auction shall commence on a date not later than March 12, 2009. The USEB Debtors shall notify all Qualified Bidders that have submitted Qualified Bids of the time and place of the Auction.

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $500,000. Silver Point shall be entitled to bid, at each round of the Auction, the full amount of the Break-Up Fee and the assumption or release of the additional USEO Indebtedness. In calculating the value of Silver Point's bid, Silver Point shall receive a 100% dollar-for-dollar credit for the Break-Up Fee and the liabilities assumed under the Asset Purchase Agreement (as it may be modified during the Auction), including without limitation the portion of the USEO Indebtedness assumed or released pursuant to the Asset Purchase Agreement. Except as otherwise expressly set forth herein, the USEB Debtors may conduct the Auction in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Biogas Assets.

Upon conclusion of the bidding, the Auction shall be closed, and the USEB Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed Sale, and (ii) as soon as practicable thereafter identify the highest, best or otherwise financially superior offer(s) for the Biogas Assets (the "Successful Bid" and the

entity or entities submitting such Successful Bid, the "Successful Bidder"), which highest, best or otherwise financially superior offer will provide the greatest amount of net value to the USEB Debtors, and advise the Qualified Bidders and counsel to Silver Point of such determination. If Silver Point's final bid is deemed to be highest and best at the conclusion of the Auction, it will be the "Successful Bidder," and such bid, the "Successful Bid."

Each bidder is expected to confirm at the Auction that it has not engaged in any collusion with respect to the bidding or the proposed Sale.

**Acceptance of Qualified Bids**: The USEB Debtors shall sell the Biogas Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after a hearing (the "Sale Hearing"). The USEB Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute The USEB Debtors' acceptance of the bid. The USEB Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to The USEB Debtors' selection of the Successful Bidder.

**Sale Hearing:** The Sale Hearing shall be conducted by the Bankruptcy Court on a date not later than March 13, 2009. Following the approval of the sale of the Biogas Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within twenty-five (25) days after entry of an Order approving the Sale, the USEB Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and the USEB Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

**Return of Good Faith Deposit:** The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) days after closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the USEB Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

**Modifications:** USEB may (a) determine which Qualified Bid, if any, is the highest, best or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the USEB Debtors, or their respective estates and creditors. At or before the Sale Hearing, the USEB Debtors may impose such other terms and conditions as the USEB Debtors may determine to be in the best interests of the USEB Debtors, their respective estates and creditors, and other parties in interest.

29.     The USEB Debtors believe that the Bidding Procedures are fair and reasonable

and, through the vehicle of the Auction, provide the best means of ensuring that the USEB

Debtors obtain the highest or best offer for the Biogas Assets. As such, the Sale of the Biogas Assets pursuant to the Bidding Procedures will be in the USEB Debtors' best interests and the best interests of their respective estates and creditors.

30. The Bidding Procedures provide that any Qualified Bidder interested in submitting a competing bid shall be afforded due diligence opportunities prior to the Auction in an effort to compose a competing bid (a "Competing Bid"). Further, the Bidding Procedures contain a time frame that permits a prospective bidder to review its Competing Bid and, if interested, formulate a revised, increased bid. Additionally, such a time frame will allow the USEB Debtors to consider and evaluate any Competing Bid so as to ensure that such a Competing Bid is a Qualified Bid that satisfies the requirements for Auction participation. Based upon the foregoing, the USEB Debtors submit that the Bidding Procedures are in the best interests of the USEB Debtors and their respective chapter 11 estates and creditors, and should be approved by the Court.

31. Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). The Bidding Procedures reflect the proper exercise of the USEB Debtors' discretion to conduct a public auction that, because of the substantial and sophisticated nature of the contemplated transaction, is governed by a very particular and detailed set of Bidding Procedures. Accordingly, the Bidding Procedures should be approved.

**B.    The Proposed Bid Protection Should be Approved**

32. The USEB Debtors propose that if overbidding occurs at the Auction, Silver Point shall have the right, but not the obligation, to participate in overbidding subject only to the limitations provided by the Bidding Procedures. However, to compensate Silver Point for serving as a "Stalking Horse," thereby subjecting its bid to higher or otherwise better offers, the

22

USEB Debtors seek authority for the USEB Debtors to pay to Silver Point a break-up fee of $3,000,000 (the "Break-Up Fee"), to be paid as an administrative priority claim of the USEB Debtors' chapter 11 estates in the event of the Court entering an order approving the sale of the Biogas Assets pursuant to a Successful Bidder other than Silver Point or other mutually agreeable events.

33.     The USEB Debtors submit that the Break-Up Fee (a) represents a sound exercise of their business judgment, (b) is the product of extensive arm's-length negotiations, (c) is fair and reasonable, given the benefits to the estate of having a definitive Asset Purchase Agreement and the risk to Silver Point that a third-party offer may ultimately be accepted, and (d) is necessary to preserve the value of the USEB Debtors' estates.

34.     Bidding protections such as the Break-Up Fee encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("Breakup fees and other strategies may be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted); *see also In re Marrose Corp.*, Case Nos. 89-B-12171-12180, 1991 Bankr. LEXIS 2177, ** 13-14 (Bankr. S.D.N.Y. Feb. 14, 1991) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers" and that "[t]hese strategies may be necessary to convince a party to become the initial bidder").

35.     The USEB Debtors submit that approval of break-up fees and other forms of bid protections in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases. *See, e.g., Gey Assocs. Gen.*

*P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that "[b]reakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders"); *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("*Integrated Resources*") (stating that "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets"), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

36.     When analyzing the appropriateness of a break-up fee and other forms of bid protection, bankruptcy courts consider whether such bid protections serve any of three possible useful functions:  (i) to attract or retain a potentially successful bid, (ii) to establish a bid standard or minimum for other bidders to follow, or (iii) to attract potential bidders.  *See Integrated Resources*, 147 B.R. at 662.  As part of the analysis regarding bid protections, courts consider three questions:  "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?"  *Id*. at 657.

37.     The first prong of the analysis requires the Court to examine the relationship between the USEB Debtors and Silver Point.  The USEB Debtors' decision to provide Silver Point with the Break-Up Fee was reached by independent and disinterested managers.  *See Integrated Resources*, 147 B.R. at 657-58.  Thus, the "business judgment rule," which proscribes judicial second guessing of the actions of a company's board of directors taken in good faith in the exercise of honest judgment, applies.  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28. The USEB Debtors were not self tainted when they formulated the Break-Up Fee.  The USEB

Debtors and Silver Point negotiated the amount of the Break-Up Fee at arm's-length, with the assistance of financial and legal advisors.

38.     To satisfy the second prong of the analysis, the Court must determine that the Break-Up Fee will not hamper bidding.  As mentioned above, courts have found that break-up fees and expense reimbursements are necessary to create an incentive for a "stalking horse bidder" to spend the requisite time and money investigating a debtor's assets before entering into an agreement to purchase those assets. *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28 (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

39.     Here, the Break-Up Fee already has encouraged competitive bidding in that Silver Point is unwilling to commit to hold open its offer to purchase the Biogas Assets under the terms of the Asset Purchase Agreement unless the Break-Up Fee is approved.  The mere existence of the Break-Up Fee permits the USEB Debtors to insist that competing bids for the Biogas Assets be materially higher or otherwise better than Silver Point's initial bid, an unquestionable benefit to the USEB Debtors' estates.  Moreover, the amount of the Break-Up Fee is reasonably calculated to compensate Silver Point (a) for the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process, and (c) for serving as a "stalking horse" to encourage the submission of other bids.

40.     To meet the final prong of analysis, the break-up fee should constitute a "fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Resources*, 147 B.R. at 662. Although there are no specific rules relating to how large a break-up fee can be before it is considered unreasonable, courts regularly approve break-up fees approximating 2-4% of the

consideration to be paid pursuant to the underlying transaction. *See, e.g., In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Mar. 23, 2006) (approving 3.0% break-up fee plus expense reimbursement): *Allegiance Telecom Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (approving 2% break-up fee plus expense reimbursement); *In re Global Crossing Ltd.*, Case Nos. 02-40187 through 02-40241, 02-11982 (REG) (Bankr. S.D.N.Y. July 25, 2002) (approving 3% break-up fee). In this case, the break-up fee of $3,000,000 is 3.17% of the consideration contemplated in this transaction, well within the range approved by courts in this District.

41.     The Bidding Procedures, including the Break-Up Fee, have enabled the USEB Debtors to assure a sale to a contractually committed bidder at a price the USEB Debtors believe is fair and reasonable, while providing the USEB Debtors with the opportunity to obtain even greater benefits for its estate through an auction process. Thus, approval of the Break-Up Fee may lead to further compensation and the establishment of a baseline against which higher or otherwise better offers will be measured. If an auction ensues, the Break-Up Fee is reasonably calculated to encourage higher or otherwise better bids. If no auction ensues, the Break-Up Fee is still appropriate in that it has encouraged Silver Point to act as a Stalking Horse Bidder and to guarantee a minimum amount within the range of reasonably anticipated values for the Biogas Assets. The Bidding Procedures, including the Break-Up Fee, satisfy all three prongs of the standard set forth in *Integrated Resources* and should be approved.

**C.      The Proposed Sale is Within the USEB Debtors' Sound Business Judgment and Should Therefore be Approved**

42.     The USEB Debtors submit that ample authority exists for the approval of the Sale of the Biogas Assets to Silver Point pursuant to the Asset Purchase Agreement, or to such other purchaser submitting a higher or otherwise better offer for the Biogas Assets. Section 363(b) of the Bankruptcy Code permits debtors to sell assets outside of the ordinary course of their

26

business. Bankruptcy Code section 363(b) provides in pertinent part that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides further provides "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

43. Courts interpreting section 363(b)(1) have held that transactions should be approved under section 363(b)(1) when they are supported by the sound business judgment of the debtor-in-possession. *See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("*Lionel*") ("judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Courts have made it clear that a debtor-in-possession's showing of a sound business justification need not be duly exhaustive, but rather a trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require a debtor to show that a sound business purpose justifies such actions"). Whether or not there is sufficient business reasons to justify the use of assets of the estates depends upon the facts and circumstances of each case. *See Lionel*, 722 F.2d at 1071.

44. Courts routinely hold that chapter 11 debtors may sell their assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, provided that the debtors have sound

business reasons. *See, e.g., Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it"); *Official Committee of Unsecured Creditors of LTV AeroAPAce and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 144 (2d Cir. 1992) (upheld the debtor's sale of its subsidiaries because the Court found a "good business reason" supporting the sale); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action").

45.     The USEB Debtors submit that the proposed Sale of the Biogas Assets in the proposed manner represents a sound exercise of the USEB Debtors' business judgment, is for a valid business purpose, and that the terms of the Sale are fair and reasonable. The Asset Purchase Agreement was negotiated in good faith with a view towards maximizing the value of the Biogas Assets for the estate's creditors. The USEB Debtors are confident that the purchase price will be the best price achievable under the circumstances. Nevertheless, the Asset Purchase Agreement is subject to Bidding Procedures designed to ensure that the highest or otherwise best offer has been or will be received.

46.     The Bankruptcy Code further provides for the right of Silver Point to credit bid its secured claims with respect to the USEB Indebtedness and NPI Indebtedness. In particular § 363(k) of the Bankruptcy Code provides in relevant part that:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). "It well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459 (3d Cir. 2006); *see also In re SunCruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("The plain language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*") (emphasis in original); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof") (quoting legislative history) (alteration in original) (internal quotation marks omitted).

47.     Further, because the USEB Debtors expect to be able to pay all allowed claims in full, Silver Point is entitled to credit bid the entire amount of the USEO Indebtedness.

**D.      <u>The Sale Should be Approved Free and Clear of Encumbrances</u>**

47.     Section 363 of the Bankruptcy Code, among other things, authorizes a debtor to use, sell or lease property of the estate outside of the ordinary course of business free and clear of any interest in such property. *See* 11 U.S.C. § 363(f). Here, Silver Point, the sole party with liens on the Biogas Assets, is the purchaser of the Biogas Assets under the Asset Purchase Agreement and has agreed to assume the secured debt on the Biogas Assets and the USEO Indebtedness as consideration for the Biogas Assets. If a transaction arising from a Competing Bid is consummated, Silver Point as a secured creditor consents to such sale because the secured debt on the Biogas Assets (*i.e.*, the USEB Indebtedness and NPI Indebtedness and USEO Indebtedness) and the Break-Up Fee will be paid in full out of the proceeds of the sale, contemporaneously with the closing.

48.     The USEB Debtors submit that, in the event a transaction arising from a Competing Bid is consummated, the contemporaneous payment of the USEB Indebtedness, the

NPI Indebtedness and the USEO Indebtedness (to the extent of sufficient proceeds) is entirely appropriate because (i) it is a precondition to Silver Point's consent to the sale as required by section 363(f)(2) of the Bankruptcy Code, and (ii) it would make no economic sense for the USEB Debtors or their estates to retain the proceeds in escrow and continue to incur the substantial ongoing interest accruals and "negative carry" with respect to the USEB Indebtedness, the NPI Indebtedness and the USEO Indebtedness held by Silver Point.

### E.     The Asset Purchase Agreement Does Not Dictate the Terms of a Plan of Reorganization

49.     The Asset Purchase Agreement does not dictate the terms of a plan of reorganization, as it does not attempt to restructure the rights of creditors and equity security holders.  The USEB Debtors recognize that a sale of assets may not be approved where such a sale dictates the terms of a plan of reorganization, thereby denying creditors and equity security holders the procedural protections of the plan process.  In the instant case, however, there are no conditions in the Asset Purchase Agreement that determine the contours of a plan.  The sole impact of the consummation of the transactions under the Asset Purchase Agreement is to convert the Biogas Assets to cash and relieve the USEB Debtors' estates of significant liabilities. *See In re Naron & Wagnor, Charted*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) ("sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure the rights of creditors").

### F.     The Purchaser is Entitled to the Protections Afforded to a Good Faith Purchaser Under Section 363(m) of the Bankruptcy Code

50.     Bankruptcy Code section 363(m) provides that a purchaser of property of a debtor's estate is protected from the effects of reversal on appeal of authorization to the debtor to sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a

stay of the sale order.[6] Bankruptcy Code section 363(m) "affords finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bid." *In re Chateaugay Corp.*, 1993 U.S. Dist. LEXIS 6130, * 9 (S.D.N.Y. May 10, 1993) (internal quotation marks and citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)... provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

51.    The Bankruptcy Code does not define "good faith," but courts have adopted various definitions. A good faith purchaser is "one who buys property...for value, without knowledge of adverse claims." *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993). The requirement that a purchaser act in good faith speaks to the integrity of the purchaser's conduct in the course of the sale proceeding. *See In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d at 390.

52.    The terms of the Asset Purchase Agreement were negotiated at arm's-length, without collusion or fraud, in good faith and all of the terms of the Asset Purchase Agreement have been disclosed. The USEB Debtors and Silver Point are not related companies and they do not share corporate officers or directors. The terms of the Asset Purchase Agreement do not personally benefit any insider of the USEB Debtors. These negotiations have involved

---

[6]    Section 363(m) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

substantial time and energy by the parties and their professionals, and the Asset Purchase Agreement reflects give-and-take and compromise by both sides. Accordingly, the USEB Debtors request that the Court determine that Silver Point (or alternatively, the Successful Bidder in the event it is not Silver Point, who will have then been required to participate in the Auction in accordance with the Court-approved Bidding Procedures) has acted in good faith, has bought for value and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. *See In re United Press Int'l, Inc.*, Case No. 91-B-13955, 1992 Bankr. LEXIS 842, ** 3, 10 (Bankr. S.D.N.Y. May 18, 1992).

### G. The Court Should Approve (1) the Proposed Dates for (a) the Auction, (b) the Bid Deadline and (c) the Sale Hearing, and (2) the Proposed Form of Notice of the Auction, the Bidding Procedures, and the Sale Hearing

53.     The USEB Debtors request that the Court set certain dates and approve the form and manner of notice of the Auction and the Sale, the Bidding Procedures, and the Sale Hearing. Specifically, the USEB Debtors propose that the Court (i) set the date for the Auction on March 12, 2009 at 10:00 a.m. (prevailing Eastern Time); (ii) set the Bid Deadline on March 9, 2009 at 12:00 p.m. (prevailing Eastern Time); and (iii) set the Sale Hearing on March 13, 2009 at 10:00 a.m. (prevailing Eastern Time). The USEB Debtors submit that the fixing of such dates will facilitate the sale process and enable the USEB Debtors to provide interested parties with sufficient notice of the Auction, the Bidding Procedures and the Sale Hearing, while, at the same time, permit the USEB Debtors the opportunity to achieve their goal of consummating the bid of the Successful Bidder as expeditiously as practicable.

54.     In accordance with Bankruptcy Rules 2002 and 6004(a), the USEB Debtors request that the notice of the Auction, the Bidding Procedures and the Sale Hearing be limited to a specifically prescribed list of parties that the USEB Debtors believe may have an interest in these matters. In particular, in accordance with Bankruptcy Rule 2002(a)(2) (requiring "at least

20 days' notice by mail" to "the trustee, all creditors and indenture trustees…(2)…unless the court for cause shown shortens the time or directs another method of giving notice"), the USEB Debtors propose to limit and give notice as follows:

> (a) by mailing, within two (2) business days after the entry of the Bidding Procedures Order, a copy of such order, and the notice substantially in the form annexed hereto as **Exhibit C** (the "Auction and Sale Hearing Notice") via United States Postal Service, First Class mail, postage prepaid delivery, to (i) the Office of the Untied States Trustee for the Southern District of New York, (ii) all parties that the USEB Debtors and their professionals have identified that are likely to have an interest in submitting competing bids, (iii) all parties that have filed a notice of appearance or a request for notices pursuant to Bankruptcy Rule 2002, and (iv) the attorneys for the administrative agents for the USEB Debtors' prepetition secured lenders;

> (b) electronic notification through posting on the Court's website at www.nysb.uscourts.gov; and

> (c) within five (5) business days after entry of the Bidding Procedures Order, publishing a notice substantially in the form annexed hereto as **Exhibit D** (the "Publication Notice") once in the national edition of The Wall Street Journal.

55.     The USEB Debtors submit that the form, manner and limited recipients of the notice proposed by the USEB Debtors constitute good and sufficient notice of the Auction, the Bidding Procedures, and the Sale Hearing and all proceedings to be held thereon because such notice is reasonably calculated to provide timely and adequate notice to the USEB Debtors' creditor and equity constituencies, those persons interested in the USEB Debtors' chapter 11 case, those persons most interested in bidding on the Biogas Assets and to any interested parties who are unknown to the USEB Debtors and their professionals, and, therefore no other or further notice need be given.

### H.     Assumption and Assignment of Executory Contracts and Unexpired Leases

56.     Section 365(a) of the Bankruptcy Code provides that a debtor or trustee may assume and assign executory contracts and unexpired leases in certain circumstances. *See* 11 U.S.C. § 365 (a) (a debtor-in-possession "subject to the court's approval may assume or reject

any executory contracts or unexpired leases of the debtor"). Upon the finding that a debtor has exercised its sound business judgment in determining whether to assume an executory contract or unexpired lease courts will approve the assumption under Bankruptcy Code section 365(a). *See Nostas Assoc. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996). Under the terms of the Asset Purchase Agreement, the USEB Debtors have agreed to assume and assign certain executory contracts and unexpired leases (collectively, the "Assumed and Assigned Agreements") to the Successful Bidder, although the list of Assumed and Assigned Agreements is subject to change. The USEB Debtors' assumption of the Assumed and Assigned Agreements will be contingent and effective only upon closing the Closing. Bankruptcy Code section 365(k) provides that the assignment by the debtor to an entity of a contract or a lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after the assignment." 11 U.S.C. § 365(k). Pursuant to Bankruptcy Code section 365(k), the USEB Debtors and their estates will therefore be relieved from any liability for any such breach of an Assumed and Assigned Agreement. Accordingly, the assumption of the Assumed and Assigned Contracts will be an exercise of the USEB Debtors' sound business judgment.

57. Bankruptcy Code section 365(b) requires that a debtor cure, or provide adequate assurance that the debtor promptly will cure, any defaults that existed under the executory contract or unexpired lease sought to be assumed, other than those defaults relating to insolvency, bankruptcy, other financial conditions of the debtors or penalty rates imposed by the debtors' failing to perform non-monetary obligations under the executory contract or lease. *See* 11 U.S.C. § 365(b). The USEB Debtors and/or the Successful Bidder will provide the counter-parties to such Assumed and Assigned Agreements with adequate assurance of future performance by the Successful Bidder under those contracts in accordance with § 365(f).

Accordingly, the USEB Debtors submit that a sound business justification for the assumption and assignment of the Assumed and Assigned Agreements exists and that authorizing their assumption and assignment to the Successful Bidder is appropriate and should be approved.

58. While the USEB Debtors do not believe that any defaults exist with respect to the Assumed and Assigned Agreements, other than limited monetary defaults, the USEB Debtors either will cure, cause the Successful Bidder to cure, or provide adequate assurance that the USEB Debtors promptly will cure the pre-petition defaults, if any, under such Assumed and Assigned Agreements in accordance with § 365(b). To that end, at least three days after the entry of the Bid Procedures Order, the USEB Debtors intend to file with the Court and serve upon, among others, the counterparties to the Assumed and Assigned Agreements, the Cure Notice which will identify the amounts (the "Cure Amounts") the USEB Debtors assert are necessary to cure any existing defaults under each Assumed and Assigned Agreement. The USEB Debtors propose that any counterparty to an Assumed and Assigned Agreement that disagrees with the proposed Cure Amount for such Assumed and Assigned Agreement, or that objects to the proposed assumption and assignment of such Assumed and Assigned Agreement, including, but not limited to, objections related to adequate assurance of future performance, should be required to file and serve an objection to such Cure Amount or to the assumption and assignment of such Assumed and Assigned Agreement by no later than March 6, 2009, at 10:00 a.m. (prevailing Eastern Time) (the "Cure Amount Objection Deadline"), provided, however, that in the event the Auction results in a Successful Bidder other than the Stalking Horse Bidder, the deadline for objections to the assignment of executory contracts and unexpired leases to such Successful Bidder shall be the commencement of the Sale Hearing. Any such objection should be in writing and set forth in reasonable detail (a) the nature of and grounds for the objection, and (b) if the objection relates to the Cure Amount, the amount that the counter-party believes is

the appropriate Cure Amount, and should be accompanied by a reasonably detailed statement supporting the counter-party's allegation of the appropriate Cure Amount. The USEB Debtors further request that any counter-party that fails to timely file and serve an objection by the Objection Deadline (i) be forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure amount or other amounts with respect to the Assumed and Assigned Agreements, and the USEB Debtors and the Successful Bidder will be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notice; (ii) be deemed to have consented to the assumption and assignment; and (iii) be forever barred and estopped from asserting against the USEB Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

59. The USEB Debtors further propose that if a non-debtor counterparty to an Assumed and Assigned Agreement timely files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amounts"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent of such consensual resolution, the USEB Debtors shall promptly provide the Successful Bidder notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter. Pending a ruling on such objection, if not made at the Sale Hearing, the amount necessary will be reserved and paid upon a final Court order determining the correct Cure Amount and will be paid as provided in the Agreement. All other objections to the proposed assumption and assignment of the Assumed and Assigned Agreements will be heard at the Sale Hearing.

60.     Pursuant to Bankruptcy Code section 365(f)(2), a debtor may assign an executory contract or an unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent). Among other things, "adequate assurance of future performance" may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give its strong likelihood of succeeding; chief factor in determining adequate assurance is whether rent will be paid). At the Sale Hearing, the USEB Debtors will be prepared to proffer testimony or present evidence to demonstrate the financial credibility, willingness, and ability of Silver Point or the Successful Bidder other than Silver Point to perform under the Assumed and Assigned Agreements.

## I.     Request for Relief Under Bankruptcy Rules 6004(h) and 6006(d)

61.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "an order authorizing the trustee to assign an executory contract or unexpired lease under 365(f) is stayed until the expiration of 10 days after the entry of the order,

unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The USEB Debtors request that any order approving the Sale and the assumption and assignment of the Assumed and Assigned Agreements to Silver Point or the Successful Bidder other than Silver Point, as the case may be, be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**J. The Court Should Approve the Liquidation and Termination of Non-Debtor Subsidiaries That Lack Operations.**

62. As previously described, Debtor USEB has a number of direct and indirect subsidiaries that no longer conduct operations. Silver Point has no interest in acquiring such entities, as they are not a part of the USEB Debtors' current operations. Many of these entities could have been terminated prior to Petition Date by the USEB Debtors, but for want of sufficient time to complete the process. Accordingly, the USEB Debtors request that the Court enter an Order authorizing Debtor USEB to dissolve and terminate the following entities: Biomass Energy Partners II L.P; Biomass Energy Partners III, L.P.; Biomass Energy Partners V, L.P.; Brookhaven Energy Partners, LLC; Broome Landfill Gas Associates, L.P; Brown County Landfall Gas Associates, L.P.; Brown County Energy Associates, LLC; Burlington Energy, Inc; Cape May Energy Associates, L.P.; Cape May Landfill Gas Associates, L.P.; Garland Energy Development, LLC; Garland Landfil Gas Associates, L.P.; Onondaga Energy Partners, L.P.; Taylor Energy Partners, L.P; Smithtown Energy Partners, L.P.; Springfield Energy Associates, Ltd. Partnership; Zapco Broome Nanticoke Corp.; Zapco Energy Tactics Corp.; ZMG Gasco, Inc.; and ZFC Royalty Trust II.

**VI.    Notice**

63. Notice of this Motion and a copy of this Motion has been provided to: (a) to the Office of the United States Trustee for the Southern District of New York; (b) the attorneys for the administrative agent for the USEB Debtors' prepetition secured lenders; (c) the USEB

Debtors' known unsecured creditors; and (d) all parties having filed in these cases a notice of appearance or a request for notices pursuant to Bankruptcy Rule 2002. The USEB Debtors submit that no other or further notice need be provided.

## VII.    No Prior Request

64.    No prior motion for the relief requested herein has been made to this or any other court.

## VIII.    Conclusion

WHEREFORE, the USEB Debtors respectfully request (i) entry of the Bidding Procedures Order, (ii) entry of the Sale Order, and (iii) the granting to the USEB Debtors of such other and further relief as the Court may deem just and proper.

Dated:  January 23, 2009    Respectfully submitted,
   New York, New York

         */s/ Peter S. Partee*_____
         Peter S. Partee
         Scott H. Bernstein
         HUNTON & WILLIAMS LLP
         200 Park Avenue, 53rd Floor
         New York, New York 10166-0136
         (212) 309-1000

           -and-

         Michael G. Wilson (admitted *pro hac vice*)
         HUNTON & WILLIAMS LLP
         Riverfront Plaza, East Tower
         951 East Byrd Street
         Richmond, Virginia 23219-4074
         (804) 788-8200

         *Proposed Attorneys for Debtors and*
          *Debtors-in-Possession*