**Date and Time for Hearing on Approval of Bidding Procedures: 2/22/10 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline for Approval of Bidding Procedures: 2/17/10 at 4:00 p.m. (prevailing Eastern Time)**

**Proposed Date and Time for Hearing on Approval of Sale: 3/23/10 at 10:00 a.m. (prevailing Eastern Time)**
**Proposed Objection Deadline for Approval of Sale: 3/18/10 at 4:00 p.m. (prevailing Eastern Time)**

Peter S. Partee
Scott H. Bernstein
Robert A. Rich
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

-and-

Michael G. Wilson (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

*Attorneys for Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| U.S. ENERGY SYSTEMS, INC., *et al.*,[1] | ) Case No. 08-10054 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |

### MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION U.S. ENERGY SYSTEMS, INC. FOR ENTRY OF ORDERS (I) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF THE PLYMOUTH SHARES, (II) APPROVING BIDDING AND AUCTION PROCEDURES, (III) APPROVING THE PROPOSED BID PROTECTION TO THE STALKING HORSE BIDDER, (IV) SETTING A DATE AND TIME FOR A HEARING TO APPROVE THE SALE RESULTING FROM AUCTION, (V) APPROVING THE SALE OF THE PLYMOUTH SHARES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (VI) APPROVING THE <u>STOCK PURCHASE AGREEMENT, AND (VII) GRANTING RELATED RELIEF</u>

---

[1]      The other Debtors are the following: U.S. Energy Overseas Investments, LLC, U.S. Energy Biogas Corp., Biogas Financial Corp., Power Generation (Suffolk), Inc., Resources Generating Systems, Inc., Suffolk Biogas, Inc., USEB Assignee, LLC, ZFC Energy, Inc., ZMG Inc., and Oceanside Energy, Inc.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

U.S. Energy Systems, Inc. ("USEY"), one of the debtors and debtors-in-possession in the above-captioned cases, by and through its undersigned counsel, hereby moves (the "Motion") this Court for entry of an order, in substantially the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) authorizing and scheduling an auction (the "Auction") for the sale of the Plymouth Shares (defined below) free and clear of all claims (as defined in section 101(5) of the United States Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Encumbrances"), (ii) approving bidding and auction procedures (the "Bidding Procedures") in connection with the Auction, (iii) approving the proposed bid protection for Nakash Energy, LLC ("Nakash") in accordance with that certain Stock Purchase Agreement (the "Stock Purchase Agreement"), dated January 27, 2010, by and among USEY and Nakash in substantially the form annexed hereto as **Exhibit C**, (iv) setting a date and time for a hearing (the "Sale Hearing") to consider the sale (the "Sale") of the Plymouth Shares, and (v) granting related relief.  USEY further moves this Court for the entry of an order, in substantially the form annexed hereto as **Exhibit B** (the "Sale Order"), (i) approving and authorizing the sale of the Plymouth Shares free and clear of all Encumbrances, and (ii) granting related relief.  In support of the Motion, USEY respectfully represents as follows:

## I.    Background

### A.    The Chapter 11 Cases

1.    On January 9, 2008, USEY, U.S. Energy Overseas Investments, LLC, and GBGH, LLC (collectively, the "USEY Debtors") filed their respective voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, §§ 101-1532 (as amended, the

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.     On January 23, 2009 (the "USEB Petition Date"), U.S. Energy Biogas Corp., Biogas Financial Corp., Power Generation (Suffolk), Inc., Resources Generating Systems, Inc., Suffolk Biogas, Inc., USEB Assignee, LLC, ZFC Energy, Inc., ZMG Inc., and Oceanside Energy, Inc. (collectively, the "USEB Debtors," and together with the USEY Debtors, the "Debtors") filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

3.     The Debtors' chapter 11 cases have been procedurally consolidated for administrative purposes and are being jointly administered by this Court.  With the exception of GBGH, LLC, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee has been appointed in the Debtors' cases.

4.     On the USEB Petition Date, the USEB Debtors and Silver Point Finance, LLC ("Silver Point") entered into an asset purchase agreement (the "Asset Purchase Agreement"), pursuant to which Silver Point entered into a legally binding bid to acquire substantially all of the assets (the "Biogas Assets") of the USEB Debtors free and clear of all liens, claims and encumbrances, except those associated with the indebtedness being assumed pursuant to the Asset Purchase Agreement.

5.     On March 17, 2009, the Court entered an order [Docket No. 430] approving the sale of the Biogas Assets to Silver Point or its designee pursuant to the terms of the Asset Purchase Agreement.  On March 27, 2009, the sale of the Biogas Assets to Silver Point closed.

6.      Upon the consummation of the sale of the Biogas Assets pursuant to the Asset Purchase Agreement, Silver Point assumed all of the USEB Debtors' ordinary course liabilities, including but not limited to trade payables, costs associated with curing contracts to be assumed and assigned in the USEB Debtors' bankruptcy cases, costs associated with rejecting contracts in the USEB Debtors' bankruptcy cases, costs arising under any assigned assets, all liabilities related to employment benefit plans of USEB, all liabilities arising out of the employment or termination of any USEB employee arising after the Closing Date (as defined in the Asset Purchase Agreement), and liabilities for the reasonable, documented administrative expenses of USEY and the USEB Debtors under section 503(b)(1) of the Bankruptcy Code in an amount that may not exceed $4.3 million in the aggregate

7.      *The Modified Second Amended Plan of Reorganization of GBGH, LLC* [Docket No. 535] became effective on June 9, 2009.  On September 21, 2009, the Court entered a *Final Decree and Order* [Docket No. 670] closing GBGH, LLC's bankruptcy case.

**B.      The Plymouth Shares**

8.      USEY, through its one hundred percent ownership interest (the "Plymouth Shares") in Plymouth Envirosystems, Inc., a Delaware corporation, owns an approximately fifty percent limited partnership interest in Plymouth Cogeneration Limited Partnership.  Plymouth Cogeneration Limited Partnership owns and operates a combined heat and power plant (the "Plymouth Facility") that produces 1.2 megawatts of electricity and 7.0 megawatts of heat at Plymouth State College in Plymouth, New Hampshire.  The Plymouth Facility supplies heat and electricity to Plymouth State College under a long-term contract.

9.      During the past year, USEY marketed the Plymouth Shares to a number of entities that it considers likely to have an interest in the Plymouth Shares.  Several months ago, after no

other entities expressed an interest in making a hard offer for the Plymouth Shares, Nakash, a substantial equity holder in USEY, expressed an interest in the Plymouth Shares and agreed to act as a "stalking horse bidder" in connection with the proposed Sale prior to the filing of this Motion.

10.     After an initial $200,000 stalking horse bid was made by Nakash, a $220,000 stalking horse offer surfaced from another group affiliated with two members of USEY's Board of Directors.  Subsequently, because each of the potential stalking hose bidders was affiliated with members of USEY's Board of Directors and, thus, not disinterested, the USEY Board of Directors unanimously passed a resolution specifying simple bidding and auction procedures for the selection of the stalking horse bidder, which procedures were formulated by USEY's counsel and approved by USEY's Chief Accounting Officer, Richard J. Augustine.  These procedures were implemented without exception and resulted in the amount of Nakash's stalking horse bid increasing from $200,000 to $600,000.

11.     On January 27, 2010, USEY and Nakash entered into the Stock Purchase Agreement, pursuant to which Nakash entered into a legally binding bid to acquire the Plymouth Shares and, if deemed the Successful Bidder (defined below) at the Auction, has agreed to purchase the Plymouth Shares free and clear of Encumbrances.  Nakash has agreed that its offer is subject to USEY exercising its fiduciary duties to consider higher and otherwise better offers for the Plymouth Shares.  Accordingly, USEY continues its efforts to market the Plymouth Shares to parties that might be interested and qualified to make an offer.  As a result of those efforts, USEY submits that upon the conclusion of the Auction, the offer submitted by the Successful Bidder (defined below) will constitute the highest or otherwise best offer for the

Plymouth Shares and will generate the maximum value for the benefit of its estate and its creditors.

**C.  Nakash**

12.     Nakash is a substantial equity holder of USEY, and two of USEY's directors, Robert Spiegelman and Emzon Shung, are affiliated with Nakash.  Accordingly, Nakash is an insider of USEY as such term is defined in section 101 of the Bankruptcy Code.  USEY waives any conflict of interest that may arise as a consequence of the foregoing and consents to Robert Spiegelman and Emzon Shung assisting Nakash and providing services to Nakash in connection with the Stock Purchase Agreement and the transactions contemplated thereby.  The Stock Purchase Agreement and the transactions contemplated therein have been approved by a majority of the disinterested members of USEY's Board of Directors.

**D.  The Stock Purchase Agreement**

13.     A summary of the principal terms of the Stock Purchase Agreement, set forth in full in the Stock Purchase Agreement, are as follows:[2]

- **Sale Assets**:  All of USEY's right, title and interest in the Plymouth Shares shall be sold free and clear of all Encumbrances thereon and there against in accordance with section 363 of the Bankruptcy Code.

- **Purchase Price**:  Pursuant to the Stock Purchase Agreement, the purchase price (the "Purchase Price") to be paid by Nakash for the Plymouth Shares shall be $600,000.

- **Break-Up Fee**:  If USEY consummates a competing transaction with a person or entity other than Nakash, then USEY shall pay to Nakash an amount equal to (i) three percent (3%) of the Purchase Price, plus (ii) all documented reasonable out-

---

[2]     The summary contained herein is qualified in its entirety by reference to the provisions of the Stock Purchase Agreement.  In the event of any inconsistencies between the provisions of the Stock Purchase Agreement and the terms herein, the terms of the Stock Purchase Agreement shall govern.  If there is any inconsistency between this Motion and the Stock Purchase Agreement, the terms of the Stock Purchase Agreement shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meaning assigned to such terms in the Stock Purchase Agreement.

of-pocket expenses incurred by Nakash's professionals in connection with the transaction contemplated by the Stock Purchase Agreement (provided that such expenses shall not exceed $20,000).

**E.** **Disclosures Pursuant to the *Amended Guidelines for the Conduct of Asset Sales***

14.     The Stock Purchase Agreement contains the following provisions, which the

*Amended Guidelines for the Conduct of Asset Sales* (the "Guidelines"), adopted by this Court's

General Order M-383, requires to be separately disclosed:

- **Purchaser**:  Nakash is an insider of USEY as such term is defined in section 1101 of the Bankruptcy Code.

- **Sale Free and Clear**:  As described above and below, the sale of the Plymouth Shares pursuant to the Stock Purchase Agreement will be free and clear of all Encumbrances.

15.     The proposed form of Sale Order contains the following provisions which the

Guidelines require to be separately disclosed:

- **Relief from Bankruptcy Rule 6004(h)**:  As describe below, USEY seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

- **Requested Findings as to Fraudulent Conveyance**:  USEY believes the consideration that will be provided by Nakash for the Plymouth Shares will constitute reasonably equivalent value for the Plymouth Shares under the Bankruptcy Code and other applicable law.

- **Requested Findings as to Successor Liability**:  USEY asserts there will be no substantial continuity between USEY and Nakash, there will be no continuity of enterprise between USEY and Nakash, Nakash will not be a mere continuation of USEY or USEY's estate, and Nakash will not constitute a successor to USEY or USEY's estate.

## II.     Jurisdiction, Venue and Predicates for Relief

16.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the

*Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the*

*Southern District of New York* dated July 10, 1984 (Ward, Acting C.J.).  Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A),(N) and (O).

17.     The predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

### III.     <u>Summary of Relief Requested</u>

18.     USEY submits that the prompt commencement of the sale process is the best interests of its estate because the consummation of the transaction contemplated by the Stock Purchase Agreement will monetize USEY's sole remaining non-litigation asset.  By this Motion, USEY seeks to commence and consummate the sale process in a cost-efficient and streamlined manner.  USEY submits that many of the parties that may have an interest in purchasing the Plymouth Shares already have been contacted.  Approving the marketing and sale process embodied in the Bidding Procedures will intensify the interest in the Plymouth Shares among the parties previously contacted by USEY.

19.     By this Motion, USEY seeks entry of the Bidding Procedures Order, substantially in the form annexed hereto as **<u>Exhibit A</u>**, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, authorizing and approving the Bidding Procedures, including (i) authorizing and scheduling an auction of the Plymouth Shares to be held on March 17, 2010 at 10:00 a.m. (prevailing Eastern Time); (ii) approving the proposed Bid Protection (defined below) to Nakash; and (iii) approving the form and manner of the notice of the Auction and Sale Hearing (the "<u>Auction and Sale Hearing Notice</u>"), in substantially the form annexed hereto as **<u>Exhibit D</u>**.

20.     Subject to the terms of the Bidding Procedures Order, at a hearing that USEY

requests to be held on March 23, 2010 at 10:00 a.m. (prevailing Eastern Time), USEY requests

entry of the Sale Order, in substantially the form annexed as **Exhibit B**, pursuant to sections

105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, authorizing

and approving (i) the sale of the Plymouth Shares to the winning bidder at the Auction, and (ii) if

a competing transaction is consummated, the allocation of a sufficient amount of the proceeds to

pay the proposed Bid Protection (defined below) to Nakash.

## IV.     Basis for Relief

### A.     The Proposed Bidding and Auction Procedures Should Be Approved

21.     In order to maximize the value of the Plymouth Shares for the benefit of USEY's

chapter 11 estate and its creditors, USEY seeks to implement a competitive bidding process for

transactions of this size and nature that is designed to generate a maximum return on the

Plymouth Shares.

22.     USEY proposes that competing bids for the Plymouth Shares be governed by the

following Bidding Procedures:

**The Bidding Process**:  USEY and its advisors shall have the sole right to (i) determine whether
any person that submits a bid for the Plymouth Shares is a Qualified Bidder (defined below), (ii)
coordinate the efforts of Qualified Bidders in conducting their respective due diligence reviews,
(iii) receive offers from Qualified Bidders, and (iv) evaluate and negotiate any offers made to
purchase the Plymouth Shares (collectively, the "Bidding Process").  Any person that wishes to
participate in the Bidding Process must be a Qualified Bidder.  Neither USEY nor its
representatives shall be obligated to furnish information of any kind whatsoever to any person
that is not a Qualified Bidder.  USEY shall have the right to amend the Bidding Procedures in
writing, which in no event shall be inconsistent with the terms of the Stock Purchase Agreement
or any order of the Bankruptcy Court, including the Bidding Procedures Order.

**Participation Requirements**:  Any person that wishes to participate in the Bidding Process (a
"Potential Bidder") must become a "Qualified Bidder."  As a prerequisite to becoming a
Qualified Bidder (and thus, among other things, prior to being able to conduct due diligence), a
Potential Bidder must deliver (unless previously delivered) to USEY, not later than fourteen (14)
days after entry of the Bidding Procedures Order:  (i) an executed confidentiality agreement in
form and substance satisfactory to USEY, and (ii) sufficient information, as requested by USEY,

to allow USEY to determine that the Potential Bidder has the financial wherewithal to close the sale transaction, including but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to USEY) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder.

A Qualified Bidder is a Potential Bidder that delivers the documents described in subparagraphs (i) and (ii), and that USEY determines is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by USEY) to submit a bona fide offer and to be able to consummate a sale if selected as the Successful Bidder (defined below).  Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, USEY shall determine, and shall notify the Potential Bidder, if such a Potential Bidder is a Qualified Bidder.

**Due Diligence:**  USEY may afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence on matters related to the Plymouth Shares; provided, however, that USEY shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).  USEY will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders.  Neither USEY nor any of its respective representatives are obligated to furnish any information to any person other than a Qualified Bidder.

**Bid Requirements:**  All bids must include (unless such requirement is waived by USEY) the following requirements (the "Bid Requirements"):

- A cash purchase price, the value of which is determined by USEY to be equal to or greater than the sum of (a) the Purchase Price, (b) the Break-Up Fee (defined below), and (c) $20,000.

- A letter stating that the Qualified Bidder's offer if chosen as the second highest or otherwise best Qualified Bid is irrevocable until after the consummation of the sale of the Plymouth Shares to the Successful Bidder.

- An executed copy of a purchase agreement pursuant to which the Qualified Bidder proposes to acquire the Plymouth Shares, which purchase agreement shall include a commitment to close by a date not later than April 30, 2010.

- A $60,000 good faith deposit (the "Good Faith Deposit").

- Written evidence of a commitment for financing or other evidence of the ability to consummate the sale reasonably satisfactory to USEY with appropriate contact information for such financing sources.

- The identity of each entity that will be participating in such bid, including any proposed designee(s).  Further, each bid must provide sufficient financial information and other information regarding both the Qualified Bidder and all other parties

participating in the bid to satisfy USEY with respect to the requirements enumerated in section 363(m) of the Bankruptcy Code or otherwise provided for herein.

- A blackline comparing the Qualified Bidder's proposed purchase agreement against that of Nakash.

A bid received from a Qualified Bidder that includes all of the Bid Requirements shall be a "Qualified Bid." USEY reserves the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest, best or otherwise financially superior offer.

**Bid Deadline**:  A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to (i) US Energy Systems, Inc., 40 Tower Lane, 1st Floor, Avon, Connecticut 06001 (Attn: Richard J. Augustine), and (ii) Hunton & Williams LLP, 200 Park Avenue, New York, New York 10166-0091 (Attn:  Peter S. Partee, Esq. and Scott Bernstein, Esq.), attorneys for USEY, not later than noon (prevailing Eastern Time) on March 16, 2010 (the "Bid Deadline").

**Proposed Purchaser is a Qualified Bidder/Stock Purchase Agreement is Qualified Bid**: Nakash is a Qualified Bidder, and the Stock Purchase Agreement is Qualified Bid.  Nakash's offer to purchase the Plymouth Shares as set forth in the Stock Purchase Agreement is irrevocable until (i) after the consummation of a sale of the Plymouth Shares to a Successful Bidder other than Nakash, and (ii) the Stock Purchase Agreement is validly terminated in accordance with its terms.

**"As Is, Where Is"**:  The sale of the Plymouth Shares shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by USEY, its agents or its estate except to the extent set forth in the Stock Purchase Agreement.  Nakash and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Plymouth Shares prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Plymouth Shares in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Plymouth Shares, or the completeness of any information provided in connection therewith or at the Auction, except as expressly stated in the stock purchase agreement of another Successful Bidder.

**Plymouth Shares to be Sold Free of Any and All Encumbrances**:  All of USEY's right, title and interest in the Plymouth Shares shall be sold free and clear of all Encumbrances thereon and there against in accordance with section 363 of the Bankruptcy Code.

**Auction**:  If more than one Qualified Bid has been received (in addition to the Stock Purchase Agreement), USEY shall conduct the Auction with respect to the Plymouth Shares.  The Auction shall commence on a date not later than March 17, 2010 at 10:00 a.m.  USEY shall notify all Qualified Bidders that have submitted a Qualified Bid of the time and place of the Auction. Each Qualified Bidder is expected to confirm at the Auction that it has not engaged in any collusion with respect to the Bidding Process or the proposed Sale.

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the

Auction.  During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $10,000.  Nakash shall be entitled to bid, at each round of the Auction, the full amount of the Break-Up Fee.  In calculating the value of Nakash's bid, Nakash shall receive 100% dollar-for-dollar credit for the Break-Up Fee.  Except as otherwise expressly set forth herein, USEY may conduct the Auction in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Plymouth Shares.

Upon conclusion of the bidding, the Auction shall be closed, and USEY shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the proposed Sale, and (ii) as soon as practicable thereafter identify the highest and best offer for the Plymouth Shares (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder") and advise the Qualified Bidders of such determination and counsel to Nakash of such determination.  If Nakash's final bid is deemed to be the highest and best bid a the conclusion of the Auction, Nakash will be the "Successful Bidder" and such bid will be the "Successful Bid."

**Acceptance of Qualified Bids**:  USEY shall sell the Plymouth Shares to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after a hearing (the "Sale Hearing").  USEY's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute USEY's acceptance of the Qualified Bid.  USEY will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.  All interested parties reserve their right to object to USEY's selection of the Successful Bidder.

**Sale Hearing**:  The Sale Hearing shall be conducted by the Bankruptcy Court on a date not later than March 23, 2010.  Following the approval of the sale of the Plymouth Shares to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within twenty-five (25) days after entry of the Sale Order, USEY shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and USEY shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

**Return of Good Faith Deposit**:  Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) Business Days after the closing of the transaction contemplated by the Successful Bid, and thereafter returned to the respective bidders.  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, USEY shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

**Modifications**:  USEY may (a) determine which Qualified Bid, if any, is the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the

requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the proposed Sale, or (iii) contrary to the best interests of USEY, its estate and its creditors. At or before the Sale Hearing, USEY may impose such other terms and conditions as USEY may determine to be in the best interests of USEY, its estate, its creditors and other parties in interest.

23.     USEY believes that the Bidding Procedures are fair and reasonable and, through the vehicle of the Auction, provide the best means of ensuring that USEY obtains the highest or best offer for the Plymouth Shares. As such, the sale of the Plymouth Shares pursuant to the Bidding Procedures will be in the best interests of USEY, its estate and its creditors.

24.     The Bidding Procedures provide that any Qualified Bidder interested in submitting a competing bid shall be afforded due diligence opportunities prior to the Auction in an effort to compose a competing bid (a "Competing Bid"). Further the Bidding Procedures, contain a time frame that permits a prospective bidder to review its Competing Bid and, if interested, formulate a revised, increased bid. Additionally, such a time frame will allow USEY to consider and evaluate any Competing Bid so to as ensure that such a Competing Bid is a Qualified Bid that satisfies the requirements for Auction participation. Based upon the foregoing, USEY submits that the Bidding Procedures are in the best interests of USEY, its estate, and its creditors, and should be approved by the Court.

25.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be made by private sale or private auction. *See* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction"). The Bidding Procedures reflect the proper exercise of USEY's discretion to conduct a public auction that, because of the sophisticated nature of the contemplated transaction, is governed by a very particular and detailed set of Bidding Procedures. Accordingly, the Bidding Procedures should be approved.

## B. The Proposed Bid Protection Should be Approved

26. USEY proposes that if overbidding occurs at the Auction, Nakash shall have the right, but not the obligation, to participate in overbidding subject only to the limitations provided by the Bidding Procedures. However, to compensate Nakash for serving as a "Stalking Horse," thereby subjecting its bid to higher or otherwise better offers, USEY seeks authority to pay to Nakash a break-up fee of $18,000 (the "Break-Up Fee") and to reimburse Nakash's actual out-of-pocket due diligence costs and expenses in an amount up to $20,000 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protection"), as an administrative priority claim of USEY's estate in the event of the Court entering an order approving the sale of the Plymouth Shares to a Successful Bidder other than Nakash or upon the occurrence of other mutually agreeable events.

27. USEY submits that the Bid Protection (a) represents a sound exercise of its business judgment, (b) is the product of extensive, arm's-length, and good faith negotiations, (c) is fair and reasonable, given the benefits to USEY's estate of having a definitive Stock Purchase Agreement and the risk to Nakash that a third-party offer may ultimately be accepted, and (d) is necessary to preserve the value of USEY's estate.

28. Bid protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risk and uncertainties of the chapter 11 process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("Breakup fees and other strategies may be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted); *see also In re Marrose Corp.*, Case Nos. 89-B-12171-12180, 1991 Bankr. LEXIS 2177, ** 13-14

(Bankr. S.D.N.Y. Feb. 14, 1991) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers" and that "[t]hese strategies may be necessary to convince a party to become the initial bidder").

29.     USEY submits that approval of break-up fees and other forms of bid protections in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases.  *See, e.g., Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that "[b]reakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders"); *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating that "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets"), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The Break-Up Fee and Expense Reimbursement, if payable, would be paid for by the additional proceeds that would be realized from the sale of the Plymouth Shares at the Auction.

30.     When analyzing the appropriateness of a break-up fee and other forms of bid protection, bankruptcy courts consider whether such bid protections serve any of three possible useful functions:  (i) to attract or retain a potentially successful bid, (ii) to establish a bid standard or minimum for other bidders to follow, or (iii) to attract potential bidders.  *See Integrated Resources*, 147 B.R. at 662.  As part of the analysis regarding bid protections, courts consider three questions:  "(1) is the relationship of the parties who negotiated the break-up fee tainted by

self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *Id*. at 657.

31.    The first prong of the analysis requires the Court to examine the relationship between USEY and Nakash.  USEY's decision to provide Nakash with the Bid Protection was reached by independent and disinterested directors.  *See Integrated Resources*, 147 B.R. at 657-58.  Thus, the "business judgment rule," which proscribes judicial second guessing of the actions of a company's board of directors taken in good faith in the exercise of honest judgment, applies. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28.  USEY was not self tainted when they formulated the Bid Protection.  USEY and Nakash negotiated the amount of the Bid Protection in good faith and at arm's-length, and USEY was assisted in the negotiations by its bankruptcy counsel.

32.    To satisfy the second prong of the analysis, the Court must determine that the Bid Protection will not hamper bidding.  As mentioned above, courts have found that break-up fees and expense reimbursements are necessary to create an incentive for a "stalking horse bidder" to spend the requisite time and money investigating a debtor's assets before entering into an agreement to purchase those assets.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28 (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

33.    Here, the Bid Protection already has encouraged competitive bidding in that Nakash is unwilling to commit to hold open its offer to purchase the Plymouth Shares under the terms of the Stock Purchase Agreement unless the Bid Protection is approved.  The mere existence of the Bid Protection permits USEY to insist that competing bids for the Plymouth

Shares be materially higher or otherwise better than Nakash's initial bid, an unquestionable benefit to the USEY's estate. Moreover, the amount of the Break-Up Fee is reasonably calculated to compensate Silver Point (a) for the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process, and (c) for serving as a "stalking horse" to encourage the submission of other bids.

34. To meet the final prong of analysis, the break-up fee should constitute a "fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Resources*, 147 B.R. at 662. Although there are no specific rules relating to how large a break-up fee can be before it is considered unreasonable, courts regularly approve break-up fees approximating 2-3% of the consideration to be paid pursuant to the underlying transaction. *See, e.g., In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Mar. 3, 2006) (approving 3.0% break-up fee plus expense reimbursement): *Allegiance Telecom Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (approving 2% break-up fee plus expense reimbursement); *In re Global Crossing Ltd.*, Case Nos. 02-40187 through 02-40241, 02-11982 (REG) (Bankr. S.D.N.Y. July 25, 2002) (approving 3% break-up fee). In this case, the Break-Up Fee of $18,000 is 3% of the consideration contemplated in this transaction, well within the range approved by courts in this District.

35. The Bidding Procedures, including the Bid Protection, have enabled USEY to assure a sale to a contractually committed bidder at a price USEY believes is fair and reasonable, while providing USEY with the opportunity to obtain even greater benefits for its estate through an auction process. Thus, approval of the Bid Protection may lead to further compensation and the establishment of a baseline against which higher or otherwise better offers will be measured.

If an auction ensues, the Bid Protection is reasonably calculated to encourage higher or otherwise better bids. If no auction ensues, the Bid Protection is still appropriate in that it has encouraged Nakash to act as a stalking horse bidder and to guarantee a minimum amount within the range of reasonably anticipated values for the Plymouth Shares. The Bid Protection, including the Break-Up Fee, satisfy all three prongs of the standard set forth in *Integrated Resources* and should be approved.

  **C. The Proposed Sale is Within USEY's Sound Business Judgment
   and Should Therefore be Approved**

  36. USEY submits that ample authority exists for the approval of the Sale of the Plymouth Shares to Nakash pursuant to Stock Purchase Agreement, or to such other purchaser submitting the highest or otherwise best offer for the Plymouth Shares. Section 363(b) of the Bankruptcy Code permits debtors to sell assets outside of the ordinary course of their business. Bankruptcy Code section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides further provides "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

  37. Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved under section 363(b)(1) when they are supported by the sound business judgment of the debtor-in-possession. *See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("*Lionel*") ("judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 615-16

(Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Courts have made it clear that a debtor-in-possession's showing of a sound business justification need not be duly exhaustive, but rather a trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions"). Whether there are sufficient business reasons to justify the use of assets of the bankruptcy estate depends upon the facts and circumstances of each case. *See Lionel*, 722 F.2d at 1071.

38. Courts routinely hold that chapter 11 debtors may sell their assets pursuant to section 363(b) of the Bankruptcy Code prior to confirmation of a chapter 11 plan, provided that the debtors have sound business reasons. *See, e.g., Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it"); *Official Committee of Unsecured Creditors of LTV AeroAPAce and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 144 (2d Cir. 1992) (upheld the debtor's sale of its subsidiaries because the Court found a "good business reason" supporting the sale); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action").

39. USEY submits that the proposed Sale of the Plymouth Shares in the proposed manner represents a sound exercise of USEY's business judgment, is for a valid business

purpose, and that the terms of the Sale are fair and reasonable. The Stock Purchase Agreement was negotiated in good faith with a view toward maximizing the value of the Plymouth Shares for USEY's estate and its creditors. USEY is confident that the purchase price will be the best price achievable under the circumstances. Nevertheless, the transaction embodied in the Stock Purchase Agreement is subject to Bidding Procedures designed to ensure that the highest or otherwise best offer has been or will be received.

### D.     The Sale Should be Approved Free and Clear of Encumbrances

40.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell or transfer all or any part of its property free and clear of any and all liens in such property if (i) such sale/transfer is permitted under non-applicable bankruptcy law, (ii) the party asserting such a lien consents to such sale/transfer, (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (iv) the lien is the subject of a bona fide dispute, or (v) the party asserting the lien could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C. § 363(f); *see also In re Dundee Equity Corp.,* 1992 Bankr. LEXIS 436, * 12 (Bankr. S.D.N.Y. Mar. 6, 1992) (a "sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); *Citicorp Homeowners Services, Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) is written in disjunctive; therefore, court may approve sale "free and clear" provided at least one of the subsections is met).

41.     If a creditor with an alleged lien does not object to the relief requested in this Motion, such failure to object may be deemed consent under section 363(f)(2) of the Bankruptcy Code. *See Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994) (by not objecting to the sale motion, the secured creditor was deemed to consent

under section 363(f)(2) of the Bankruptcy Code); *see also Pelican Homestead & Sav. A'ssn v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). In the unlikely event that a creditor purports to hold a lien on the Plymouth Shares, USEY requests that the liens (if any) asserted against the Plymouth Shares by a creditor purporting to be a secured creditor be transferred and attached to the net sale proceeds (if any), in the same order of priority and with the same validity as they now have against the Plymouth Shares, received by USEY, against which the lien is alleged, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto. *See In re Circus Time, Inc.*, 5 B.R. 1, 7 (Bankr. D. Me. 1979).

**E.      The Stock Purchase Agreement Does Not Dictate the Terms of a Plan of Reorganization**

42.      The Stock Purchase Agreement does not dictate the terms of a plan of reorganization, as it does not attempt to restructure the rights of creditors and equity security holders. USEY recognizes that the sale of assets may not be approved where such a sale dictates the terms of a plan of reorganization, thereby denying creditors and equity security holders the procedural protection of the plan process. In the instant case, however, there are no conditions to the Stock Purchase Agreement that determine the contours of a chapter 11 plan. The sole impact of the consummation of the transaction under the Stock Purchase Agreement is to convert the economic value of the Plymouth Shares to cash. *See In re Naron & Wagnor, Charted*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) (holding that the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure the rights of creditors").

**F.      The Purchaser is Entitled to the Protections Afforded to a Good Faith Purchaser Under Section 363(m) of the Bankruptcy Code**

43.      Section 363(m) of the Bankruptcy Code provides that a purchaser of property of a debtor's estate is protected from the affects of reversal on appeal of authorization to the debtor to

sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale order.[3] Section 363(m) of the Bankruptcy Code "affords finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bid." *In re Chateaugay Corp*., 1993 U.S. Dist. LEXIS 6130, * 9 (S.D.N.Y. May 10, 1993) (internal quotation marks and citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

44.     The Bankruptcy Code does not define "good faith," but courts have adopted various definitions.  A good faith purchaser is "one who buys property…for value, without knowledge of adverse claims." *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993).  The requirement that a purchaser act in good faith speaks to the integrity of the purchaser's conduct in the course of the sale proceeding. *See In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d at 390.

45.     The terms of the Stock Purchase Agreement have been negotiated at arm's-length, without collusion or fraud, in good faith and all of the terms of the Stock Purchase Agreement have been disclosed.  Accordingly, USEY requests that the Court determine that the Successful Bidder has acted in good faith, has bought for value and is entitled to the protections of a good

---

[3]     Section 363(m) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

faith purchaser under section 363(m) of the Bankruptcy Code. *See In re United Press Int'l, Inc.*, Case No. 91-B-13955, 1992 Bankr. LEXIS 842, ** 3, 10 (Bankr. S.D.N.Y. May 18, 1992) (holding that asset purchase agreement negotiated in good faith and at arm's-length is entitled to protection under section 363(m) of the Bankruptcy Code).

**G.    The Court Should Approve (1) the Proposed Dates for (a) the Auction, (b) the Bid Deadline and (c) the Sale Hearing, and (2) the Proposed Form of Notice of the Auction, the Bidding Procedures, and the Sale Hearing**

46.    USEY requests that the Court set certain dates and approve the form and manner of notice of the Auction, the Bidding Procedures, and the Sale Hearing. Specifically, USEY proposes that the Court (i) set the date and time for the Auction as March 17, 2010 at 10:00 a.m. (prevailing Eastern Time); (ii) set the Bid Deadline as March 16, 2010 at noon (prevailing Eastern Time); and (iii) set the Sale Hearing as March 23, 2010 at 10:00 a.m. (prevailing Eastern Time). USEY submits that the fixing of such dates will facilitate the sale process and enable USEY to provide interested parties with sufficient notice of the Auction, the Bidding Procedures and the Sale Hearing, while, at the same time, permit USEY the opportunity to achieve its goal of consummating the bid of the Successful Bidder as expeditiously as practicable.

47.    In accordance with Bankruptcy Rules 2002 and 6004(a), USEY requests that the notice of the Auction, the Bidding Procedures and the Sale Hearing be limited to a specifically prescribed list of parties that USEY believes may have an interest in these matters. In particular, in accordance with Bankruptcy Rule 2002(a)(2) (requiring "at least 21 days' notice by mail" to "the trustee, all creditors and indenture trustees…(2)…unless the court for cause shown shortens the time or directs another method of giving notice"), USEY proposes to give notice as follows:

> (a) by mailing, within three (3) business days after the entry of the Bidding Procedures Order, the Auction and Sale Hearing Notice, substantially in the form annexed hereto as **Exhibit D**, via United States Postal Service, First Class mail, postage prepaid delivery, to (i) the Office of the Untied States Trustee for the Southern District of New York, (ii) all parties that USEY and its professionals

have identified as likely to have an interest in becoming Qualified Bidders, (iii) all parties that have filed a notice of appearance or a request for notices pursuant to Bankruptcy Rule 2002 in the Debtors' chapter 11 cases, and (iv) all parties that appear on USEY's creditors matrix; and

(b) electronic notification through posting on the Court's website at www.nysb.uscourts.gov.

48.     USEY submits that the form, manner and recipients of the notice proposed by USEY constitutes good and sufficient notice of the Auction, the Bidding Procedures, and the Sale Hearing and all proceedings to be held thereon because such notice is reasonably calculated to provide timely and adequate notice to USEY's creditors, those persons and entities interested in USEY's chapter 11 case, and those persons and entities most interested in bidding on the Plymouth Shares.  Therefore, USEY respectfully requests that this Court approve the foregoing notice procedures.

**H.      The Proposed Findings Regarding Successor Liability Are Appropriate**

49.     Section I.D.12 of the Guidelines requires that when a debtor requests findings that limit the purchaser's successor liability, the debtor must disclose the adequacy of the debtor's proposed notice of its requested relief and the basis therefor.  Paragraphs 8 and 9 of the proposed Sale Order limits the successor liability of Nakash, its successors and assigns.  A copy of the proposed Auction and Sale Hearing Notice (which sets forth how parties may request a copy of the proposed Sale Order or any other pleading filed in these chapter 11 cases) will be served on every person and entity listed on USEY's creditors matrix.  Extensive case law provides that, unless expressly assumed, claims against assets of the estate purchased in a court-supervised auction process attach to the proceeds of the sale of the property and not against the assets in the buyer's hands.  As a result, USEY submits that the proposed Sale Order's provisions that may have the effect of limiting successor liability are in accord with such case law.  Moreover, given

USEY's significant liabilities, the sale of the Plymouth Shares on the terms specified in the proposed Sale Order is an integral aspect of the sale of the Plymouth Shares.

50.     Courts have consistently held that a buyer of a debtor's assets pursuant to a sale under section 363 of the Bankruptcy Code takes free from successor liability resulting from pre-existing claims.  Most recently, in *In re Chrysler LLC*, the United States Court of Appeals for the Second Circuit specifically examined whether assets could be sold free and clear of successor and transferee liability claims in a sale of substantially all of the Chrysler debtors' assets pursuant to section 363 of the Bankruptcy Code.  *See In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009).  There, the Second Circuit affirmed the decision of the Bankruptcy Court, which had explicitly found that "*in personam* claims, including any potential state successor or transferee liability claims against [the Buyer], as well as *in rem* interests, are encompassed by section 363(f) and therefore extinguished by the Sale Transaction."  *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. May 31, 2009).  In ruling on this issue, the Second Circuit in *Chrysler* favorably cited *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003).  In *TWA*, the Third Circuit ruled that the language "any interest in property" in section 363(f) encompasses those claims that "arise from the property being sold," including claims arising under theories of successor and transferee liability.  *See TWA*, 322 F.3d at 290.  The Third Circuit further noted that "to allow the claimants to assert successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme."  *Id*. at 292.  The Second Circuit cited each of these propositions in its ruling in the *Chrysler* matter.  *See In re Chrysler LLC*, 576 F.3d at 125-26.

51.     Under section 363(f) of the Bankruptcy Code, Nakash is entitled to know that the Plymouth Shares are not infected with latent claims that will be asserted against Nakash after the

proposed sale is completed.  Accordingly, consistent with binding case law in this jurisdiction, the order approving the Sale should state that neither Nakash or another Successful Bidder (as applicable) is liable as successor under any theory of successor liability, for claims that encumber or relate to the Plymouth Shares.

## I.    Request for Relief Under Bankruptcy Rule 6004(h)

52.    Section I.D.16 of the Guidelines requires that a debtor disclose the basis of any request for relief from the 14-day stay imposed by Bankruptcy Rule 6004(h) in connection with a sale.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  In order to limit the costs and expenses of administrating the Plymouth Shares, it is critical that the Sale Order become final as soon as possible, thus allowing USEY to close the Sale after all closing conditions have been met or waived.  Indeed, section 6.2(h) of the Stock Purchase Agreement requires that the Sale Order become a Final Order (as defined in the Stock Purchase Agreement) as a condition precedent to closing the proposed Sale of the Plymouth Shares.  Accordingly, USEY requests that the Court authorize the parties to take any and all actions contemplated in the Stock Purchase Agreement immediately upon entry of an order with respect to the Sale of the Plymouth Shares and order that such actions are not stayed for a period of 14 days.

## V.    Notice

53.    Notice of this Motion has been provided to the:  (a) to the Office of the United States Trustee for the Southern District of New York; (b) all parties that filed a notice of appearance or a request for notices pursuant to Bankruptcy Rule 2002 in the Debtors' cases; and (c) all parties that appear on USEY's creditors matrix.  A copy of this Motion has been provided to (a) to the Office of the United States Trustee for the Southern District of New York; and (b)

all parties that have filed a notice of appearance or a request for notices pursuant to Bankruptcy Rule 2002 in the Debtors' cases. USEY submits that no other or further notice need be provided.

## VI.     No Prior Request

54.     No prior request for the relief requested herein has been made to this or any other court.

## VII.     Conclusion

WHEREFORE, USEY respectfully requests that the Court (i) enter the Bidding Procedures Order, (ii) enter the Sale Order, and (iii) the grant to USEY such other and further relief as the Court may deem just and proper.

Dated:  January 28, 2010          Respectfully submitted,
        New York, New York

                                  */s/ Scott H. Bernstein*
                                  Peter S. Partee
                                  Scott H. Bernstein
                                  Robert A. Rich
                                  HUNTON & WILLIAMS LLP
                                  200 Park Avenue, 53rd Floor
                                  New York, New York 10166-0136
                                  (212) 309-1000

                                       -and-

                                  Michael G. Wilson (admitted *pro hac vice*)
                                  HUNTON & WILLIAMS LLP
                                  Riverfront Plaza, East Tower
                                  951 East Byrd Street
                                  Richmond, Virginia 23219-4074
                                  (804) 788-8200

                                  *Attorneys for Debtors*
                                   *and Debtors-in-Possession*