# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| U.S. ENERGY SYSTEMS, INC., *et al.*, | ) | Case No. 08-10054 (RDD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT WITH RESPECT TO THE
## FIRST AMENDED CHAPTER 11 PLAN OF U.S. ENERGY SYSTEMS, INC.

Peter S. Partee
Scott H. Bernstein
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166

-and-

Michael G. Wilson (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

Dated: ~~July 2,~~**August 10,** 2010
New York, New York

*Attorneys for Debtors and*
*Debtors-in-Possession*

---

[1] The other Debtors in the jointly administered cases are the following: U.S. Energy Overseas Investments, LLC, U.S. Energy Biogas Corp., Biogas Financial Corp., Power Generation (Suffolk), Inc., Resources Generating Systems, Inc., Suffolk Biogas, Inc., USEB Assignee, LLC, ZFC Energy, Inc., ZMG Inc., and Oceanside Energy, Inc.

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE FIRST AMENDED CHAPTER 11 PLAN OF U.S. ENERGY SYSTEMS, INC. NEITHER ACCEPTANCES NOR REJECTIONS OF THE PLAN MAY BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, AMENDMENT AND SUPPLEMENTATION.**

IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON OR OTHERWISE USED FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON OR ENTITY MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS HERETO AND THERETO BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST THE DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR

TRANSFERRING, SECURITIES OF THE DEBTOR SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

> **PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I.   PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ..........................1

II.  OVERVIEW OF THE PLAN .............................................................................2

III. SOLICITATION AND VOTING PROCEDURES ...........................................4
A.   CHAPTER 11 GENERALLY .................................................................4
B.   NOTICE TO HOLDERS OF CLAIMS AND INTERESTS ....................................5
C.   SOLICITATION OF ACCEPTANCES OF THE PLAN ........................................6
D.   VOTING ON THE PLAN .....................................................................7
E.   VOTING PROCEDURES .....................................................................9
F.   WITHDRAWAL OF VOTES ON THE PLAN .................................................9
G.   OTHER GENERAL INFORMATION .......................................................10

IV.  GENERAL BACKGROUND REGARDING THE DEBTOR ..........................11
A.   OVERVIEW OF THE EVENTS LEADING TO THE FILING OF THE USEY
     DEBTORS' BANKRUPTCY PETITIONS .................................................11
B.   OVERVIEW OF THE EVENTS LEADING TO THE FILING OF THE USEB
     DEBTORS' BANKRUPTCY PETITIONS .................................................12
C.   THE DEBTORS' CAPITAL STRUCTURE ON THE PETITION DATE ....................13
D.   DESCRIPTION AND HISTORY OF THE CHAPTER 11 CASE .........................15

V.   SUMMARY OF THE FIRST AMENDED CHAPTER 11 PLAN ...................20
A.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.............20
B.   DISPUTED CLAIMS .......................................................................25
C.   MEANS FOR IMPLEMENTATION OF THE PLAN ........................................25
D.   RELEASE, INJUNCTIVE AND RELATED PROVISIONS .................................31
E.   RETENTION OF JURISDICTION ...........................................................32

VI.  CONFIRMATION OF THE PLAN..................................................................35
A.   CONFIRMATION HEARING ...............................................................35
B.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN............35

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................40
A.   FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO USEY............40
B.   FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF
     CLAIMS AND INTERESTS .................................................................42

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS .................43
A.   FAILURE TO CONFIRM THE PLAN .......................................................43
B.   DELAYS OF CONFIRMATION OR THE EFFECTIVE DATE ...........................43
C.   RISKS OF SUCCESSFULLY CREATING VALUE .........................................44
D.   CLAIM ESTIMATES .......................................................................44

E.   SILVER POINT COULD FAIL TO FUND THE SILVER POINT ADMINISTRATIVE
     CLAIMS OBLIGATION ...............................................................................44

F.   FORWARD LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT MAY
     PROVE TO BE INACCURATE .....................................................................44

IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
     PLAN .........................................................................................................45

X.   CONCLUSION.............................................................................................45

**TABLE OF EXHIBITS**

Exhibit A          First Amended Chapter 11 Plan of U.S. Energy Systems, Inc.

Exhibit B          Sources and Uses of Cash Analysis

Exhibit C          Calculation of Remaining Silver Point Administrative Claims
                   Obligation

# I.    PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement (the "Disclosure Statement") has been prepared pursuant to section 1125 of the Bankruptcy Code by U.S. Energy Systems, Inc. ("USEY" or the "Debtor"), a Delaware corporation and a debtor and debtor-in-possession in the above-captioned cases in connection with the Debtor's solicitation of votes to accept the *First Amended Chapter 11 Plan of U.S. Energy Systems, Inc.* dated July 2, 2010 (as may be amended, supplemented or otherwise modified from time to time, the "Plan"). **Capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the respective meanings ascribed to them in the Plan.**

The purpose of the Disclosure Statement is to set forth information:  (i) regarding the history of the Debtor and its business; (ii) describing the Debtor's chapter 11 case (the "Chapter 11 Case"); (iii) concerning the Plan and alternatives to the Plan; (iv) advising the Holders of Claims and Interests of their rights under the Plan; and (v) assisting the Holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.  The purpose of the Plan is to effect a restructuring of the Debtor's liabilities in a manner consistent with the Bankruptcy Code that will maximize recoveries by Creditors.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.**

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Holders of Claims and Interests under the Plan (Section V.A., *Classification and Treatment of Claims and Interests*);

- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);

- Describes the background and events leading to the Debtor's decision to commence the Chapter 11 Case (Section IV, *General Background Regarding the Debtor*);

- Describes the Debtors' capital structure (Section IV.C., *The Debtors' Capital Structure on the Petition Date*);

- Describes how the Plan will be implemented (Section V.C., *Means for Implementation of the Plan*);

- Projects the total percentage recovery that each Class of Allowed Claims and Allowed Interests is likely to receive under the Plan (Section II, *Overview of the Plan*);

- Describes certain risk factors that may affect the feasibility of the Plan and potential distributions to Creditors (Section VIII, *Certain Risk Factors and Other Considerations*); and

- Evaluates the effects on Creditors of liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX, *Alternatives to Confirmation and Consummation of the Plan*).

## II.  OVERVIEW OF THE PLAN

The Plan provides for:

- All Allowed Secured Claims to be Unimpaired, if and to the extent that any such Claims exist;

- Payment in full of all Unclassified Claims out of the Plan Fund;

- Payment in full of all Allowed Priority Non-Tax Claims out of the Plan Fund;

- Holders of Allowed General Unsecured Claims to receive (a) their Ratable Portion of the Unsecured Distribution Fund on the Unsecured Distribution Date to the extent that the Plan Administrator determines there are sufficient funds in the Unsecured Distribution Fund, if ever, to justify a Distribution to Holders of Allowed General Unsecured Claims, or (b) such other less favorable treatment as may be agreed upon by the Holder of such Claim and the Plan Administrator; and

- The indefeasible cancellation of all Allowed Interests in the Debtor.

The following table briefly summarizes the treatment of Allowed Claims and Allowed Interests.  For a more detailed description of the terms and provisions of the Plan, see Article V below.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan.  Similarly, Professional Fee Claims are not classified under the Plan.  Section V.A.1. below describes the treatment of such Unclassified Claims.

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 1**<br>**Secured Claims** | Unimpaired; Deemed to Accept; Not Entitled to Vote. Holders of Allowed Secured Claims will receive, on the Effective Date or as soon thereafter as reasonably practicable, one of the following treatments, at the sole election of USEY or the Plan Administrator: (A) Cash in the amount of such Allowed Secured Claim, (B) turnover of the Assets that constitute collateral security for such Allowed Secured Claim, or (C) such other less favorable treatment as is agreed upon by USEY or the Plan Administrator, as the case may be, and the Holder of such Allowed Secured Claim. | $0 | 100% |
| **Class 2**<br>**Priority Non-Tax Claims** | Unimpaired; Deemed to Accept; Not Entitled to Vote. Unless the Holder of an Allowed Priority Non-Tax Claim and USEY or the Plan Administrator, as the case may be, agree to a different treatment, each Holder of an Allowed Priority Non-Tax Claim will receive one of the following alternative treatments, at the sole election of USEY or the Plan Administrator: (i) to the extent, then due and owing on the Effective Date, payment of such Holder's Allowed Priority Non-Tax Claim in full, in Cash, by the Plan Administrator, (ii) to the extent not due and owing on the Effective Date, payment of such Holder's Allowed Priority Non-Tax Claim in full, in Cash, by the Plan Administrator when such Allowed Priority Non-Tax Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof, or (iii) other treatment in any manner such that the Allowed Priority Non-Tax Claims will not be Impaired. | $5,197.81 | 100% |
| **Class 3**<br>**General Unsecured Claims** | Impaired; Entitled to Vote. Holders of Allowed General Unsecured Claims will receive (a) their Ratable Portion of the Unsecured Distribution Fund on the Unsecured Distribution Date to the extent that the Plan Administrator determines there are sufficient funds in the Unsecured Distribution Fund, if ever, to justify a Distribution to Holders of Allowed General Unsecured Claims, or (b) such other less favorable treatment as may be agreed upon by the Holder of such an Allowed | $1,200,000 | 53.0% |

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | General Unsecured Claim and the Plan Administrator. | | |
| **Class 4 Interests** | Impaired; Deemed to Reject; Not Entitled to Vote. On the Effective Date, all Allowed Interests will be indefeasibly cancelled, and no Holder of an Allowed Interest will receive or retain any distribution or property on account of such Interest. | N/A | 0% |

The Debtor's estimate of Allowed Claims in Classes 1, 2 and 3, as set forth in the chart above and the sources and uses of cash analysis ("Sources and Uses of Cash Analysis") annexed hereto as **Exhibit B**, form the basis of projected recoveries for Holders of Allowed Claims in such Classes. USEY has treated the proofs of claim filed in the Chapter 11 Case by the First Lien Agent (defined below) and the Second Lien Agent (defined below) as disallowed and expunged when calculating the estimated Allowed amount of Class 3 General Unsecured Claims. USEY anticipates that the proofs of claim filed by the First Lien Agent and the Second Lien Agent will be voluntary withdrawn with prejudice prior to the Confirmation Hearing. U.S. Energy Biogas Corp. has already voluntarily waived its Class 3 General Unsecured Claims against USEY, and, thus, USEY has treated such unsecured claims as disallowed and expunged when calculating the estimated Allowed amount of Class 3 General Unsecured Claims.

*Notwithstanding the Debtor's efforts in developing the Allowed Claims estimates above and the Sources and Uses of Cash Analysis, the preparation of such estimates is inherently uncertain, and, accordingly, there is no assurance that such estimates accurately will predict the actual amount of Allowed Claims in the Chapter 11 Case. As a result, the actual amount of Allowed Claims in Classes 1, 2 and 3 may differ materially from the Debtor's estimates contained herein.*

## III.     SOLICITATION AND VOTING PROCEDURES

### A.     Chapter 11 Generally

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest. The confirmation and consummation of a plan of reorganization is the objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor. Subject to certain limited exceptions, the confirmation order provides that any debt that arose before the date of confirmation of the plan is exchanged for the consideration specified under the confirmed plan.

The Plan provides for specified payments, distributions and the other treatment to the various Holders of Claims (unclassified and classified) and Interests, which are described in detail herein. The Debtor believes that the Plan provides consideration to all Holders of Claims (unclassified and classified) and Interests that reflects an appropriate resolution of the Claims and Interests, taking into account the differing nature and priority of Claims and Interests. In addition to the voting requirements discussed below, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who nevertheless will be bound by the provisions of the Plan if it is confirmed. For a more complete description of the requirements of such tests and how the Plan satisfies such tests, see Section VI.B. of this Disclosure Statement.

**B.**      <u>Notice to Holders of Claims and Interests</u>

This Disclosure Statement is being transmitted to Holders of certain Claims against and Interests in the Debtor. The primary purpose of this Disclosure Statement is to provide those Holders of Claims voting on the Plan with adequate information to make an informed decision on whether to vote to accept or reject the Plan.

On August ⸺,**10,** 2010, the Bankruptcy Court entered an order [Docket No. ⸺**891**] approving this Disclosure Statement, finding that it contains information of a kind and in sufficient detail to enable the Holders of Claims against the Debtor that are entitled to vote to make an informed judgment about the Plan.

> **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**
>
> **IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE ANY DISTRIBUTIONS OF PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO, THE PLAN, AND ANY EXHIBITS TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**
>
> **CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BY ITS NATURE IS FORWARD LOOKING OR CONTAINS OR MAY CONTAIN ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY**

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur after the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Further, the Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct or complete as of any time after the date hereof.

**C.          Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Interests that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code have been placed in various Classes based on the nature and priority of the Claim or Interest. Each Class is either Impaired or Unimpaired under the Plan. A Class of Claims or Interests that is Unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote on the Plan. Accordingly, acceptances of the Plan are being solicited only from Holders of Allowed General Unsecured Claims in Class 3, which is the only Impaired Class that will receive distributions under the Plan. Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan, and therefore conclusively are presumed to have accepted the Plan. Holders of Interests in Class 4 will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan.

The Bankruptcy Code provides that a Class of Impaired Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code as described below) of at least two-thirds (2/3) in amount of Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, a vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, after notice and a hearing, that such an acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more complete description of the requirements of confirmation of the Plan, see Section VI.B. of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan does not accept the Plan, the Debtor reserves the right to amend the Plan or to request confirmation of the Plan (or both) pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of the Plan by one or more Impaired Classes of Claims. Under that section of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court, if among other things, the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class. For a more complete description

of the requirements of confirmation of a nonconsensual plan, see Section VI.B. of this Disclosure Statement..

D.       **Voting on the Plan**

The Voting Deadline is ~~_____,~~**September 24,** 2010 at 5:00 p.m. (prevailing Eastern Time).  To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided.  The Debtor reserves the right, in its sole discretion, to extend the Voting Deadline, in which case the term "Voting Deadline" will mean the latest date on which a Ballot will be accepted.  To the extent the Voting Deadline is extended by the Debtor, the Debtor will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote.  The notice may state that the Debtor is extending the Voting Deadline for a specified period of time or on a daily basis until 5:00 p.m., prevailing Eastern Time, on the date on which the Debtor has received sufficient acceptances to seek Confirmation of the Plan.

If you are entitled to vote to accept or reject the Plan, enclosed is a Ballot for the acceptance or rejection of the Plan and a pre-addressed return envelope for the return of the Ballot.

> **BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please use only the official Ballot or Ballots that accompanies this Disclosure Statement.  All votes to accept or reject the Plan must be cast by using that Ballot.  Votes that are cast in any manner other than on the designated Ballot will not be counted.  Ballots must be actually received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent"), at one of the addresses indicated on the Ballot, by no later than 5:00 p.m., prevailing Eastern Time, on ~~_____,~~**September 24,** 2010.  If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions on the Ballot, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan."  You may not split your vote on the Plan with respect to a particular Class.

If you are the Holder of a Claim in Class 3 and did not receive a Ballot, received a damaged or illegible Ballot or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, the Plan or the voting procedures in respect thereof, please contact the Debtor's Voting Agent at ~~(546) 228-2500.~~**(646) 282-2400.**

After carefully reviewing this Disclosure Statement, the Plan and the exhibits annexed hereto and thereto, please indicate on the enclosed Ballot your vote with respect to the Plan and whether you accept the releases set forth in section 9.1(b) of the Plan, and transmit the Ballot to the Voting Agent in accordance with either of the following two methods:

**By Hand or Overnight Delivery:**

7

**U.S. Energy Systems, Inc. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, Third Floor**
**New York, New York 10017**

**By Mail:**
**U.S. Energy Systems, Inc. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**FDR Station**
**P.O. Box 5014**
**New York, New York 10150-5014**

> **FAILURE TO COMPLY WITH THE REQUIREMENTS OF EITHER OF THESE METHODS MAY RESULT IN YOUR VOTE NOT BEING COUNTED. YOU MUST RETURN YOUR BALLOT TO THE VOTING AGENT BY THE VOTING DEADLINE.**
>
> **THE DEBTOR BELIEVES THAT PROMPT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND ALL HOLDERS OF CLAIMS. THE DEBTOR STRONGLY URGES CREDITORS TO VOTE TO ACCEPT THE DEBTOR'S PLAN.**

E.        **Voting Procedures**

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the amount of the Claim for voting purposes will be the amount shown on the Debtor's books and records and listed in the Debtor's Schedules, unless otherwise ordered by the Bankruptcy Court. If the aggregate amount of the Claims filled in on your Ballot exceeds the amount indicated by the Debtor's books and records and listed in the Debtor's Schedules, the Debtor reserves the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Bankruptcy Rule 3018. Failure by a Holder of a Claim to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan. Any executed Ballots that are timely received but do not indicate either an acceptance or a rejection of the Plan or indicate both an acceptance and a rejection of the Plan will not be counted.

Submission of all Ballots must be made directly to the Voting Agent in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

**F.        Withdrawal of Votes on the Plan**

The solicitation of acceptances of the Plan will expire on the Voting Deadline.   A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent at one of the addresses set forth on the Ballot at any time prior to the Voting Deadline.   Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;

- contain the description of the Claim; and

- be signed by the Holder in the same manner as on the Ballot.

The Debtor expressly reserves the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot.  If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted. If more than one Ballot is submitted, and the later dated Ballot(s) supplement rather than supersede the earlier Ballot(s), the subsequent Ballot(s) must be marked with the words "Additional Votes" or other language customarily used to indicate additional votes that are not meant to revoke earlier votes.

**G.        Other General Information**

The Debtor believes that the Plan provides equal or greater value to Creditors than other available alternatives.  The Debtor believes that acceptance of the Plan is in the best interests of each and every Creditor entitled to vote on the Plan and recommends that each Creditor vote to accept the Plan.  This Disclosure Statement contains good faith estimates and assumptions which are based on facts currently known to the Debtor and which may be materially different from actual future results.

**EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.   THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE**

> **THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL GOVERN.**

General information regarding the Debtor, its businesses and material events leading to the commencement of the Chapter 11 Case and the history of the Chapter 11 Case is set forth in Article IV of this Disclosure Statement. Except where otherwise noted, this information is provided by the Debtor and its management. The statements as to the Debtor's financial condition contained in this Disclosure Statement are made as of ~~___ __,~~**August 10,** 2010 (unless another time is specified), and there is no representation or implication that the information contained herein will not have changed as of any time subsequent to that date, nor will you receive any notice of such changes.

Certain risk factors and other considerations are described in Article VIII below. Alternatives to confirmation and consummation of the Plan are described in Article IX below.

> **THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE DEBTOR AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTOR DOES NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

## IV. GENERAL BACKGROUND REGARDING THE DEBTOR

### A. Overview of the Events Leading to the Filing of the USEY Debtors' Bankruptcy Petitions

USEY is a publicly-traded Delaware corporation. Through its subsidiaries, USEY was in the business of acquiring and enhancing high-potential energy assets, developing clean, efficient energy sources, producing power, developing natural resources and providing energy related services. USEY acted as a holding company with two direct subsidiaries through which it managed its two primary lines of business. The first subsidiary, Debtor U.S. Energy Biogas Corp. ("USEB"), a Delaware corporation, is discussed below. The second subsidiary is Debtor U.S. Energy Overseas Investments, LLC ("USEO"), a Delaware limited liability company. USEY owns 100% of the Class A (voting) Membership Interests in USEO. On the Petition Date, USEO owned 79% of the membership interests of Debtor GBGH, LLC ("GBGH," and together with USEO and USEY, the "USEY Debtors"). The remaining 21% of the outstanding

membership interests of GBGH were owned by Marathon Capital Holdings (UK), LLC ("Marathon").

On August 7, 2006, GBGH completed the acquisition of certain energy assets in the United Kingdom through its wholly-owned subsidiary, UK Energy Systems Limited ("UKES"), a non-debtor company registered under the laws of England and Wales. Specifically, UKES, through its acquisition of 100% of the equity interests (the "UK Subsidiaries Equity Interests") of a number of non-debtor subsidiaries located in the United Kingdom acquired (i) gas licenses (the "Gas Licenses") in respect of gas fields located in North Yorkshire, England, containing significant proven and probable natural gas reserves that are currently believed to approximate 35.1 billion cubic feet, (ii) the Knapton Generating Station, a 42 MW gas-fired power plant (the "Knapton Plant") associated with and located in the vicinity of the natural gas reserves in North Yorkshire, England, and (iii) certain related gas gathering and processing assets (the "Related Assets," and together with the UK Subsidiaries Equity Interests, the Gas Licenses, and the Knapton Plant, the "UK Assets").

At the time of the acquisition of the UK Assets, GBGH intended to further develop the natural gas fields subject to the Gas Licenses and local planning laws in a several phase process. That development plan included: (i) the expansion of the natural gas collection system in order to supply the Knapton Plant with sufficient gas to operate at full capacity on a 24 hours per day, seven days per week basis; (ii) the making of modifications to the Knapton Plant to increase efficiency; (iii) the expansion of proved and collectible gas reserves; and (iv) the construction of a pipeline to the UK's national gas transmission system to allow UKES and the UK Subsidiaries to more widely market the natural gas collected.

As UKES and the UK Subsidiaries moved to implement the development and expansion plans discussed above, the USEY Debtors budgeted approximately $36 million of the proceeds of the various financing transactions for capital expenditures to permit the UK Subsidiaries to realize on the potential of the UK Assets. Those funds were to be used to bring the Knapton Plant to full capacity, to make certain gas field production investments and to conduct 3D seismic analyses of the gas properties. The initial results of UKES's and the UK Subsidiaries' development efforts appeared promising.

In June 2007, however, USEY's board of directors were informed for the first time that the capital expenditure requirements for completion of the planned expansion of the UK Assets, based on expenditures and commitments to date, were higher than anticipated and were expected to significantly exceed the budget of $36 million--perhaps by more than 100%. In response, the USEY board of directors took a number of immediate actions, including the removal of the CEO of UKES and the UK Subsidiaries, hiring an outside law firm in the UK to investigate the failure of management to keep the respective boards of the USEY Debtors, UKES and the UK Subsidiaries properly informed, and retaining independent engineers to determine the actual extent of the capital requirements necessary to implement the planned expansion.

USEY, through its public SEC filings, also announced to the market the increase in the capital requirements and informed its investors that failure to complete the expansion of the UK Assets likely would result in the USEY Debtors' inability to generate sufficient revenue to service the debt under the Loan Agreements (as defined below). Furthermore, USEY determined

that absent a refinancing or the raising of additional capital, the USEY Debtors would not be able to meet their capital contribution obligations and likely would be in default under the Loan Agreements.

The USEY Debtors, the Prepetition Lenders (as defined below), and the numerous other constituencies that have an interest in the USEY Debtors worked diligently to address the working capital concerns faced by the USEY Debtors' operations in the United Kingdom. The USEY Debtors' boards of directors and managers, however, determined that a negotiated resolution among the numerous constituencies could not be accomplished in a timely manner outside of a court supervised process and that the commencement of bankruptcy cases was necessary to protect the value of the USEY Debtors' businesses for the benefit of the USEY Debtors' creditors and shareholders. Accordingly, on January 9, 2008, each of the USEY Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**B.**        **Overview of the Events Leading to the Filing of the USEB Debtors' Bankruptcy Petitions**

On the Petition Date, USEY owned 100% of the outstanding shares of Debtor USEB. USEB indirectly owned 19 landfill gas to energy projects in the United States, 17 of which produced electricity and 2 of which sold landfill gas as an alternative to natural gas.

On November 29, 2006, Debtor USEB and 31 of its subsidiaries (collectively, the "2006 Debtors") filed for protection under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to facilitate the restructuring of their capital structure. On May 24, 2007, the Bankruptcy Court entered an order confirming the *Joint Plan of Reorganization of U.S. Energy Biogas Corp. and its Affiliated Debtors* (the "2007 Plan"). The 2007 Plan became effective on May 31, 2007 and provided for payment in full of the allowed claims of creditors of the 2006 Debtors. On March 31, 2008, the Court entered a Final Decree and Order closing the chapter 11 cases of the 2006 Debtors.

Beginning in the summer of 2007, USEY decided to explore the possible recapitalization of USEY and its subsidiaries, including the sale of the USEB Debtors (as defined below) or substantially all of their assets. Jefferies & Company, Inc. ("Jefferies"), a prominent investment banking and financial advisory firm, was engaged to assist and advise USEY with respect to the recapitalization. Jefferies advised USEY and the USEB Debtors with respect to contacting and negotiating with prospective purchasers for the sale of the USEB Debtors and their subsidiaries or substantially all of their assets (the "Biogas Assets").

After extensive marketing, the USEB Debtors determined that the offer presented by Silver Point Finance, LLC ("Silver Point") represented the best and highest offer for the Biogas Assets. Accordingly, on January 23, 2009, the USEB Debtors and Silver Point entered into the Asset Purchase Agreement dated January 23, 2009 (the "Asset Purchase Agreement"), pursuant to which Silver Point entered into a legally binding bid to acquire the Biogas Assets and, if deemed the successful bidder at an auction, agreed to purchase the Biogas Assets free and clear of encumbrances, except to the extent set forth in the Asset Purchase Agreement. Pursuant to the

Asset Purchase Agreement, the USEB Debtors agreed, among other things, to the commencement of cases under chapter 11 of the Bankruptcy Code in order to effectuate a sale of the Biogas Assets with a closing date on such a sale to Silver Point (if the successful bidder at the auction) occurring on or before March 31, 2009. Accordingly, on January 23, 2009 (the "USEB Petition Date"), USEB, Biogas Financial Corp., Power Generation (Suffolk), Inc., Resources Generating Systems, Inc., Suffolk Biogas, Inc., USEB Assignee, LLC, ZFC Energy, Inc., ZMG Inc., and Oceanside Energy, Inc. (collectively, the "USEB Debtors," and together with the USEY Debtors, the "Debtors") commenced cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to facilitate the sale of substantially all of their assets.

## C.     The Debtors' Capital Structure on the Petition Date

To finance the acquisition of the UK Assets, the USEY Debtors entered into three inter-related secured credit facilities: (i) that certain First Lien Credit Agreement, dated August 7, 2006 (the "First Lien Credit Agreement"), by and among GBGH, as borrower, certain lenders party thereto (the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch ("Credit Suisse"), as administrative agent (the "Original First Lien Administrative Agent") and collateral agent (the "Original First Lien Collateral Agent", and together with the Original First Lien Administrative Agent, the "First Lien Agent"); (ii) that certain Second Lien Credit Agreement, dated August 7, 2006 (the "Second Lien Credit Agreement"; together with the First Lien Credit Agreement, the "GBGH Credit Agreements"), by and among GBGH, as borrower, certain lenders party thereto (the "Second Lien Lenders"; together with the First Lien Lenders, the "Prepetition Lenders"), and Credit Suisse, as administrative agent (the "Original Second Lien Administrative Agent") and collateral agent (the "Original Second Lien Collateral Agent, and together with the Original Second Lien Administrative Agent, the "Second Lien Agent"); and (iii) that certain Credit and Guaranty Agreement (the "USEO Credit Agreement"; together with the GBGH Credit Agreements, the "Loan Agreements"), dated August 7, 2006, by and among Debtor USEO, as borrower, Debtor USEY, as guarantor, the lenders party thereto (the "USEO Lenders"), and Silver Point as administrative and collateral agent (the "Third Lien Agent").

Pursuant to the GBGH Credit Agreements, GBGH borrowed $113.5 million from the First Lien Lenders and $29.5 million from the Second Lien Lenders. The proceeds of those transactions were used by GBGH to acquire the UK Assets, to fund certain reserve accounts, to acquire certain hedging instruments, and to pay the costs and fees related to those transactions. Similarly, pursuant to the USEO Credit Agreement, USEO borrowed approximately $23.3 million from the USEO Lenders, the proceeds of which were (i) contributed to GBGH to facilitate its acquisition of the UK Assets and to fund certain reserve accounts owned by GBGH for the development and expansion of the UK Assets, and (ii) used to pay the fees and expenses associated with that transaction.

In addition to the GBGH Credit Agreements, the USEY Debtors also entered into a number of security and intercreditor agreements related to the GBGH Credit Agreements, including: (i) that certain First Lien Security Agreement, dated August 7, 2006 (the "First Lien Security Agreement"), by and between GBGH and the Original First Lien Collateral Agent; (ii) that certain Second Lien Security Agreement, dated August 7, 2006 (the "Second Lien Security Agreement"), by and between GBGH and the Original Second Lien Collateral Agent; (iii) that certain Collateral and Intercreditor Agreement (the "Intercreditor Agreement"), dated August 7,

2006, by and among GBGH, the First Lien Agent, the Second Lien Agent, the Third Lien Agent, certain of the UK Subsidiaries as guarantors, and USEO and Marathon, as pledgors; and (iv) that certain Equity Support Agreement (the "Equity Support Agreement"; together with the First Lien Security Agreement, the Second Lien Security Agreement, the Intercompany Agreement and certain related agreements, the "GBGH Security Agreements"), by and among USEY, GBGH and Credit Suisse, in its capacity as Original First Collateral Lien Agent and Original Second Lien Collateral Agent. Pursuant to the GBGH Security Agreements, Debtors USEO and GBGH and the non-debtor UK Subsidiaries, among other things, granted security interests in, and liens on, substantially all of their assets as collateral security for their obligations under the GBGH Credit Agreements.

To finance the confirmation and consummation of the 2007 Plan, USEB entered into that certain Credit and Guaranty Agreement, dated as of May 31, 2007 (the "Credit and Guaranty Agreement"), by and among USEB, certain subsidiaries and affiliates of USEB, various lenders party thereto, and Silver Point, as administrative agent, collateral agent and lead arranger, and all other certificates, documents, instruments or agreements executed and delivered pursuant thereto (together with the Credit and Guaranty Agreement, the "USEB Credit Documents"). USEY, as well as a number of USEB's subsidiaries, were guarantors under the Credit and Guaranty Agreement.

The proceeds of the Credit and Guaranty Agreement allowed the 2006 Debtors to exit bankruptcy and consummate the 2007 Plan. As of the USEB Petition Date, there was $83,800,000 in outstanding indebtedness (the "USEB Indebtedness") under the USEB Credit Documents, including all interest due and owing thereunder (at the contractual non-default rate) and all unpaid fees and expenses related thereto.

An agreement (the "NPI Agreement") related to the Credit and Guaranty Agreement entitled Silver Point to a portion of the net proceeds from any sale of the assets of the USEB Debtors that is consummated after February 28, 2008. That amount was in dispute, but the parties to the Asset Purchase Agreement agreed solely for the purposes of calculating the purchase price for the Biogas Assets that the amount of indebtedness under the NPI Agreement was $5,800,000 (the "NPI Indebtedness").

**D.**        **Description and History of the Chapter 11 Case**

       1.   General Case Background

On the Petition Date, the Debtor voluntarily commenced the Chapter 11 Case before the Bankruptcy Court. The Debtor is continuing in possession of its properties and continuing to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 11, 2008, the Bankruptcy Court entered an order [Docket No. 21] directing that the USEY Debtors' chapter 11 cases be procedurally consolidated and jointly administered for procedural purposes only under Case No. 08-10054. On January 26, 2009, the Bankruptcy Court entered an order [Docket No. 326] directing that the USEY Debtors' chapter 11 cases be procedurally consolidated and jointly administered with the chapter 11 cases of the USEB Debtors for procedural purposes only under Case No. 08-10054. The Honorable Robert D. Drain is presiding over the Debtors' chapter 11 cases. As of the date hereof, an

official committee of unsecured creditors has not been appointed and no request has been made for the appointment of a trustee or an examiner in the Debtors' chapter 11 cases.

### 2. First Day Orders

On January 11, 2008, the Bankruptcy Court entered certain "first day" orders granting the USEY Debtors various forms of relief designed to stabilize, and minimize any disruption to, the USEY Debtors' business operations, including: (i) authorizing the joint administration of the USEY Debtors' chapter 11 cases [Docket No. 21], (ii) authorizing the continued maintenance of the USEY Debtors' bank accounts and continued use of existing business forms [Docket No. 25], and (iii) authorizing the USEY Debtors to pay certain prepetition employee wage and benefit claims [Docket No. 26].

### 3. Corporate Governance Litigation

On or about October 4, 2007, Asher E. Fogel (the former CEO and chairman of USEY) instituted litigation in Delaware (the "Fogel Litigation") by filing a complaint in the Court of Chancery of the State of Delaware (the "Chancery Court") against USEY and its then three independent directors (together with USEY, the "Delaware Defendants"). In the Fogel Litigation, Mr. Fogel requested that the Chancery Court order the Delaware Defendants to give notice and hold a special meeting of shareholders to vote on the removal of the then independent directors and to elect new directors.

On or about January 23, 2008, Nakash Energy LLC and certain of its affiliates (collectively, "Nakash"), who collectively own over fifteen percent of the outstanding shares of USEY and USEY's largest shareholder, instituted litigation in Delaware (the "Nakash Litigation," and together with the Fogel Litigation, the "Corporate Governance Litigation") by filing a complaint (the "Nakash Complaint") in the Chancery Court. Through the Nakash Complaint, Nakash sought, among other things, to compel an annual general meeting of shareholders for the election of directors and the removal of the then current members of the USEY Board.

On February 25, 2008, the Bankruptcy Court entered an order [Docket No. 98] (the "Settlement Order") approving a proposed settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure of the majority of the corporate governance disputes involving the USEY Debtors. The Settlement Order authorized the reconstitution of the respective boards of directors or board of managers of the USEY Debtors, and directed that the reconstituted board of directors of USEY shall remain as reconstituted until further order of the Bankruptcy Court or confirmation and substantial consummation of a chapter 11 plan for each of the USEY Debtors. Pursuant to the terms of the Settlement Order, the Nakash Litigation was voluntarily dismissed without prejudice. Since the entry of the Settlement Order, Mr. Fogel has not prosecuted the Fogel Litigation.

On February 17, 2010, the Bankruptcy Court entered an order [Docket No. 783] (the "Fogel Settlement Order") approving a proposed settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure of the disputes involving Mr. Fogel, including the Fogel Litigation. Pursuant to the terms of the Fogel Settlement Order, among other things, Mr. Fogel

has agreed to cause the dismissal of his complaint in the Chancery Court with prejudice. Accordingly, all of the issues at stake in the Corporate Governance Litigation have been consensually resolved.

### 4. Retention of the USEY Debtors' Professionals

#### a. Hunton & Williams LLP

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the chapter 11 cases, the USEY Debtors, on January 10, 2008, filed with the Bankruptcy Court an application [Docket No. 18] (the "Hunton & Williams Application") seeking entry of a final order authorizing the USEY Debtors to retain Hunton & Williams LLP ("Hunton") as their lead counsel. On January 31, 2008, the Bankruptcy Court entered a final order [Docket No. 67] approving the Hunton & Williams Application.

#### b. Jefferies & Company, Inc.

To assist them in carrying out their duties as debtors-in-possession, the USEY Debtors, on January 10, 2008, filed with the Bankruptcy Court an application [Docket No. 17] (the "Jefferies Application") seeking entry of a final order authorizing the USEY Debtors to retain Jefferies as their financial advisor. On February 14, 2008, the Bankruptcy Court entered an order [Docket No. 81] (the "Jefferies Order") approving the Jefferies Application on an interim basis and, on February 22, 2008, the Jefferies Order, in the absence of any objections to the Jefferies Application, became a final order.

#### c. Epiq Bankruptcy Solutions, LLC

On the Petition Date, the USEY Debtors filed with the Bankruptcy Court an application [Docket No. 12] (the "Epiq Application") seeking entry of a final order authorizing the USEY Debtors to retain Epiq Bankruptcy Solutions, LLC as their noticing, claims and Voting Agent. On January 31, 2008, the Bankruptcy Court entered a final order [Docket No. 66] approving the Epiq Application.

#### d. Eckert Seamans Cherin & Mellott, LLC

On February 1, 2008, the USEY Debtors filed with the Bankruptcy Court an application [Docket No. 71] (the "Eckert Application") seeking entry of a final order authorizing the USEY Debtors to retain Eckert Seamans Cherin & Mellott, LLC as the USEY Debtors' Delaware counsel. On February 26, 2008, the Bankruptcy Court entered a final order [Docket No. 100] approving the Eckert Application.

#### e. Reed Smith LLP

On April 7, 2008, the USEY Debtors filed with the Bankruptcy Court an application [Docket No. 131] (the "Reed Smith Application") seeking entry of a final order authorizing the USEY Debtors to retain Reed Smith LLP as the USEY Debtors' corporate governance counsel. On April 28, 2008, the Bankruptcy Court entered a final order [Docket No. 157] approving the Reed Smith Application.

### 5. Claims Process and Bar Date

On January 24, 2008, USEY filed with the Bankruptcy Court a statement of financial affairs, and schedules of assets, liabilities and executory contracts and unexpired leases.

On April 23, 2008, the USEY Debtors filed with the Bankruptcy Court a motion [Docket No. 150] seeking the entry of a final order establishing a deadline for filing prepetition proofs of claim in the chapter 11 cases. On May 7, 2008, the Bankruptcy Court entered a final order [Docket No. 159] establishing July 1, 2008 at 5:00 p.m. as the deadline for filing prepetition proofs of claim in the USEY Debtors' chapter 11 cases.

Approximately one hundred and forty (140) proofs of claim have been filed in the Chapter 11 Case against USEY. Approximately one hundred and fifteen (115) of such proofs of claim have been disallowed and expunged pursuant to orders entered by the Bankruptcy Court or voluntarily withdrawn by the claimants.

> **THE PLAN ESTABLISHES THAT THE BAR DATE FOR ADMINISTRATIVE CLAIMS IS FORTY-FIVE (45) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN.**

### 6. Exclusivity

The Bankruptcy Code grants a debtor an initial period of 120 days after the commencement of the chapter 11 case during which the debtor has an exclusive right to propose and file a plan of reorganization (the "Exclusive Filing Period"). If the debtor proposes and files a plan within the initial 120-day Exclusive Filing Period, then the debtor has until the end of the period ending on the 180th day after the commencement of the chapter 11 case to solicit and to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods"). The Exclusive Periods may be extended by an order of the Bankruptcy Court. Beginning on October 14, 2008, the Bankruptcy Court has entered a series of orders, without prejudice to the right of USEY to seek further extensions, sequentially extending USEY's Exclusive Solicitation Period through and including August 26, 2009.

### 7. The Sale of the Biogas Assets

On March 13, 2009, the Bankruptcy Court approved the sale of the Biogas Assets pursuant to the terms of the Asset Purchase Agreement (the "Asset Purchase Agreement"). Thereafter, on March 27, 2009, the USEB Debtors completed the sale of the Biogas Assets to certain designees of Silver Point (the "Purchasers"). Pursuant to the Asset Purchase Agreement, the Purchasers acquired the equity ownership interests in all of the underlying project entities owned by the USEB Debtors (other than Debtor Oceanside Energy, Inc.) and the operating assets of Oceanside Energy, Inc., thereby acquiring all of the economic value of the Biogas Assets. The aggregate transaction value to USEY was in excess of $122 million, including the assumption of the outstanding balance of the USEB Indebtedness, the assumption and/or release of 100% of the indebtedness arising under the USEO Credit Agreement, and the assumption and/or release of 100% of the NPI Indebtedness.

Upon the consummation of the sale of the Biogas Assets pursuant to the Asset Purchase Agreement, Silver Point also assumed all of the USEB Debtors' ordinary course liabilities, including but not limited to trade payables, costs associated with curing contracts to be assumed in the USEB Debtors' bankruptcy cases, costs associated with rejecting contracts in the USEB Debtors' bankruptcy cases, costs arising under any assigned assets, all liabilities related to employment benefit plans of USEB, all liabilities arising out of the employment or termination of any USEB employee arising after the Closing Date (as defined in the Asset Purchase Agreement), and liabilities for the reasonable, documented administrative expenses of USEY and the USEB Debtors under section 503(b)(1) of the Bankruptcy Code in an amount that may not exceed $4.3 million in the aggregate, subject to various caps and limitations (the "Silver Point Administrative Claims Obligation").  A detailed calculation of the remaining amount of the Silver Point Administrative Claims Obligation is annexed hereto as **Exhibit C**.  Accordingly, the sale of the Biogas Assets itself did not result in the realization of any proceeds that may be used to pay the Holders of Claims against USEY, with the exception of Holders of Administrative Claims.

8.   The Sale of the USEY Sale Assets

In connection with the sale of the Biogas Assets pursuant to the Asset Purchase Agreement, USEY entered into a certain letter agreement dated January 23, 2009 (the "Sale Agreement") with Silver Point.  Pursuant to the Sale Agreement, USEY agreed to sell its ownership interests (the "ZFC Interests") in ZFC Royalty Partners, a Connecticut limited partnership, and a general release (the "Release") to Silver Point, and to assume, assign and sell a certain Pollution Legal Liability Policy (the "Policy," and together with the Release and the ZFC Interests, the "USEY Sale Assets") to Silver Point in exchange for a payment in cash in the amount of $100,000 to USEY at least two business days prior to the Closing Date (as defined in the Asset Purchase Agreement).  The sale of the USEY Sale Assets to Silver Point pursuant to the Sale Agreement has been consummated.

9.   Confirmation and Consummation of the Modified Second Amended Plan of Reorganization of GBGH, LLC

On May 26, 2009, the Bankruptcy Court entered an order [Docket No. 584] confirming the *Modified Second Amended Plan of Reorganization of GBGH, LLC* [Docket No. 535] (the "GBGH Plan") pursuant to Chapter 11 of the Bankruptcy Code.  On June 9, 2009 (the "GBGH Effective Date") the GBGH Plan became effective.  On September 21, 2009, the Bankruptcy Court entered a *Final Decree and Order* [Docket No. 670] closing GBGH's bankruptcy case.

The GBGH Plan resolved all outstanding claims against, and interests, in GBGH. Holders of membership interests in GBGH, including USEY, did not receive or retain any property or consideration under the GBGH Plan.  In fact, on the GBGH Effective Date, all existing membership interests in GBGH were cancelled, including USEY's 79% ownership interest in GBGH which it owned through USEO.  Accordingly, the confirmation and consummation of the GBGH Plan did not result in the realization of any proceeds that may be used to pay Holders of Clams against USEY.

10. The Sale of the Plymouth Shares

On the Petition Date, USEY, through its one hundred percent ownership interest (the "Plymouth Shares") in Plymouth Envirosystems, Inc., a Delaware corporation, owned an approximately fifty percent limited partnership interest in Plymouth Cogeneration Limited Partnership. Plymouth Cogeneration Limited Partnership owns and operates a combined heat and power plant (the "Plymouth Facility") that produces 1.2 megawatts of electricity and 7.0 megawatts of heat at Plymouth State College in Plymouth, New Hampshire. The Plymouth Facility supplies heat and electricity to Plymouth State Collage under a long-term contract.

On January 27, 2010, USEY and Nakash entered into a certain stock purchase agreement (the "Stock Purchase Agreement"), pursuant to which Nakash entered into a legally binding agreement to pay $600,000 for the Plymouth Shares free and clear of all liens, claims and encumbrances. Nakash had agreed that its offer for the Plymouth Shares was subject to USEY exercising its fiduciary duties to consider higher and otherwise better offers for the Plymouth Shares. On February 22, 2010, the Bankruptcy Court entered an order [Docket No. 785] authorizing an auction and related bidding procedures for the sale of the Plymouth Shares. As a result of the auction for the Plymouth Shares, the purchase price paid by Nakash for the Plymouth Shares increased from $600,000 to $800,000. On April 5, 2010, the Bankruptcy Court entered an order [Docket No. 810] approving the sale of the Plymouth Shares to Nakash. On May 7, 2010, the sale of the Plymouth Shares to Nakash closed. The net proceeds of the sale of the Plymouth Shares will be used to used to fund Distributions to Holders of Allowed Claims, including Holders of Allowed Administrative Claims and Allowed Priority Tax Claims, and to pay the additional costs of winding-down USEY and the USEY Estate.

11.     The Avoidance Actions

During the summer of 2009, USEY propounded letters to seven entities for the purpose of demanding the return of certain prepetition transfers that were subject to avoidance and recovery as preferential transfers under sections 547 and 550 of the Bankruptcy Code (collectively, the "Avoidance Claims"). On November 25, 2009, USEY commenced adversary proceedings in the Bankruptcy Court against six of the entities for the purpose of avoiding and recovering the preferential transfers. Thereafter, USEY settled its causes of action against these seven entities in exchange for settlement payments that in the aggregate amount to $203,750.00.

V.     SUMMARY OF THE FIRST AMENDED CHAPTER 11 PLAN

THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY THE PLAN AND ITS EXHIBIT, ALL OF WHICH ARE ANNEXED HERETO AS EXHIBIT A. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN SHALL GOVERN.

**A.** **Classification and Treatment of Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Classification of Claims and Interests in the Plan is for all purposes, including voting, confirmation and Distribution pursuant to the Plan.

A Claim or an Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any remainder of such a Claim or an Interest qualifies within the description of such different Class.

A Claim or Interest is placed in a particular Class only to the extent that such a Claim or an Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding any Distribution provided for in the Plan, no Distribution on account of any Claim is required or permitted unless and until such a Claim becomes an Allowed Claim, as the case may be, if at all, until after the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article III of the Plan.

The Plan designates three Classes of Claims, one Class of Interests and leaves certain Claims unclassified. The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

1. <u>Unclassified Claims – Administrative Claims and Priority Tax Claims</u>

(a) Administrative Claims

Administrative Claims are those Claims asserted against USEY that constitute a cost or an expense of administration of the Chapter 11 Case allowed under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code including without limitation (i) any actual and necessary costs and expenses incurred after the Petition Date of preserving any of the Assets and any actual and necessary costs and expenses of operating USEY's business; (ii) any allowance of compensation and reimbursement of expenses of Professionals, pursuant to sections 328, 329, 330 or 331 of the Bankruptcy Code, to the extent allowed by the Bankruptcy Court and certain other amounts as set forth in the Plan; and (iii) any fees or charges assessed against USEY under 28 U.S.C. §§ 1911-1930. The Bankruptcy Code does not require Administrative Claims to be classified under a plan. It does, however, require that Allowed Administrative Claims be paid in full in Cash in order for a plan to be confirmed, unless a Holder of an Allowed Administrative Claim consents to different treatment.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Administrative Claim that is Allowed shall be paid by USEY or the Plan Administrator, as the case may be, out of the Plan Fund, in full, in Cash, in such amount as such Administrative Claim is Allowed by the Bankruptcy Court (a) upon the later of the

Effective Date or, if such Claim is Allowed after the Effective Date, as soon as reasonably practicable after the date upon which such Claim becomes an Allowed Administrative Claim, (b) upon such terms of any agreement governing or documents evidencing such Administrative Claim, or (c) as may be agreed upon between the Holder of such Allowed Administrative Claim and USEY or the Plan Administrator.

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator and counsel to the Plan Administrator by the Administrative Claims Bar Date. Persons and Entities that have provided goods or non-professional services to USEY during the Chapter 11 Case in the ordinary course of USEY's business must File a request for payment of Administrative Claims and serve such request on the Plan Administrator and counsel to the Plan Administrator by the Administrative Claims Bar Date. Any Person or Entity that is required to File and serve a request for payment of an Administrative Claim and fails to timely File and serve such a request shall be forever barred, estopped and enjoined from asserting such Administrative Claim or participating in Distributions on account thereof.

The Plan Administrator, in his sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Plan Administrator or any other party with standing to object to a request for payment of an Administrative Claim shall have the right to object to any Administrative Claim by the Administrative Claims Objection Deadline, subject to extensions from time to time by the Bankruptcy Court, and must File and serve such an objection on the appropriate parties, including the claimant. Unless the Plan Administrator or another party with standing objects to an Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Plan Administrator or another party with standing objects to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, submit the matter to the Bankruptcy Court for a determination of whether an Administrative Claim should be allowed, and if so, in what amount.

The Distributions to Holders of Allowed Administrative Claims under the Plan will be in full and complete satisfaction, settlement and release of, and in exchange for, such Allowed Claims. The Plan Administrator and USEY, as the case may be, will pay Allowed Administrative Claims only from the Plan Fund.

**THE PLAN ESTABLISHES THE ADMINISTRATIVE CLAIMS BAR DATE AS THE DATE THAT IS FORTY-FIVE (45) DAYS AFTER THE EFFECTIVE DATE OF THE PLAN. ALL REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS ARISING ON OR BEFORE THE EFFECTIVE DATE, INCLUDING CLAIMS OF PERSONS AND ENTITIES THAT SUPPLIED GOODS OR RENDERED SERVICES TO USEY IN THE ORDINARY COURSE OF BUSINESS, SHALL BE FILED WITH THE BANKRUPTCY COURT AND SERVED IN ACCORDANCE WITH THE PLAN, THE BANKRUPTCY CODE AND THE BANKRUPTCY RULES OR BE FOREVER BARRED.**

(b)        Professional Fee Claims

Notwithstanding any other provision of the Plan, any Professional seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Professional Fees incurred through and including the Effective Date under sections 328, 329, 330, 331 or 503(b) of the Bankruptcy Code must File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date and serve such a final application on the Plan Administrator and counsel to the Plan Administrator no later than the Administrative Claims Bar Date. If the Plan Administrator or any other party with standing objects to such a request, such objecting party will File and serve on the appropriate parties such objection no later than the Administrative Claims Objection Deadline, and the fee application shall be scheduled for hearing to consider and resolve the objection at the Bankruptcy Court's earliest convenience.

To the extent that an award of Professionals Fees is granted by the Bankruptcy Court, on, or as soon as reasonably practicable after (i) the Effective Date, if such Administrative Claim on account of Professional Fees is an Allowed Administrative Claim as of the Effective Date, or (ii) the date on which such Administrative Claim for Professional Fees becomes an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim for Professional Fees shall receive in full settlement, satisfaction and release of, and in exchange for, such Allowed Administrative Claim, Cash in an amount equal to the unpaid amount of such Allowed Administrative Claim.

The Plan Administrator may pay the charges incurred by USEY's Advisors on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including fees and expenses related to the preparation of the USEY's Advisors' fee applications) without application to, or approval of, the Bankruptcy Court. The Plan Administrator shall pay Allowed Administrative Claims on account of Professional Fees and Professionals' fees and costs incurred by USEY's Advisors and the Plan Administrator's Advisors on or after the Effective Date only from the Plan Fund.

(c)        Priority Tax Claims

Priority Tax Claims are Claims asserted by Governmental Units entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but does require that such Claims receive the treatment described below unless the Holder of such Claim consents to different treatment. At the sole option of the USEY or the Plan Administrator, as the case may be, each Holder of an Allowed Priority Tax Claim will receive (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code, or (b) such other less favorable treatment as may be agreed upon between the Holder of such an Allowed Priority Tax Claim and USEY or the Plan Administrator. The Distributions to Holders of Allowed Priority Tax Claims under the Plan will be in full and complete satisfaction, settlement and release of, and exchange for, such Allowed Claims. The Debtor believes the treatment afforded to Holders of Allowed Priority Tax Claims under the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code. The Plan Administrator will pay Allowed Priority Tax Claims only from the Plan Fund.

A Priority Tax Claim that is a Disputed Claim will not receive any Distribution unless and until such a Claim becomes an Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Allowed Secured Claim, it will be classified as a Class 1 Secured Claim.

2. Class 1 - Secured Claims

(a)      *Classification*: Class 1 consists of Allowed Secured Claims.

(b)      *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Secured Claims will be unaltered by the Plan. In full and complete satisfaction, settlement and release of, and exchange for, each Allowed Secured Claim, each Holder of an Allowed Secured Claim will receive, on the Effective Date or as soon thereafter as reasonably practicable, one of the following treatments, at the sole election of USEY or the Plan Administrator: (A) Cash in the amount of such Allowed Secured Claim, (B) turnover of the Assets that constitute collateral security for such Allowed Secured Claim, or (C) such other less favorable treatment as is agreed upon by USEY or the Plan Administrator, as applicable, and the Holder of such Allowed Secured Claim. Distributions to Holders of Allowed Secured Claims will only be made from the Plan Fund.

(c)      *Voting*: Class 1 is Unimpaired. The Holders of Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3. Class 2 – Priority Non-Tax Claims

(a)      *Classification*: Class 2 consists of Allowed Priority Non-Tax Claims.

(b)      *Treatment*: The legal, equitable and contractual rights of Holders of Allowed Priority Non-Tax Claims will be unaltered by the Plan. In full and complete satisfaction, settlement and release of, and exchange for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim will receive one of the following treatments at the sole election of the Plan Administrator:

      (i)      to the extent then due and owing on the Effective Date, such an Allowed Priority Non-Tax Claim will be paid in full, in Cash, by the Plan Administrator;

      (ii)      to the extent not due and owing on the Effective Date, such an Allowed Priority Non-Tax Claim will be paid in full, in Cash, by the Plan Administrator when and as such Allowed Priority Non-Tax Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof;

      (iii)      such an Allowed Priority Non-Tax Claim will be otherwise treated in any manner such that Class 2 will not be Impaired; or

(iv)        such other less favorable treatment as is agreed upon by the Plan Administrator and the Holder of such an Allowed Priority Non-Tax Claim.

Distributions to Holders of Allowed Priority-Non Tax Claims will only be made from the Plan Fund.

(c)      *Voting*:  Class 2 is Unimpaired.  The Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 4.  Class 3 - General Unsecured Claims

(a)      *Classification.*  Class 3 consists of Allowed General Unsecured Claims.

(b)      *Treatment.*  In full and complete satisfaction, settlement and release of, and in exchange for, the Allowed General Unsecured Claims, the Holders of the Allowed General Unsecured Claims will receive (a) their Ratable Portion of the Unsecured Distribution Fund on the Unsecured Distribution Date to the extent that the Plan Administrator determines there are sufficient funds in the Unsecured Distribution Fund, if ever, to justify a Distribution to Holders of Allowed General Unsecured Claims, or (b) such other less favorable treatment as may be agreed upon by the Holder of such Claim and the Plan Administrator. Distributions to Holders of Allowed General Unsecured Claims will be made only from the Unsecured Distribution Fund.

(c)      *Voting.*  Class 3 is Impaired.  The Holders of the Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 5.  Class 4 - Interests

(a)      *Classification*:  Class 4 consists of Allowed Interests.

(b)      *Treatment*:  On the Effective Date, the Allowed Interests will be indefeasibly cancelled.

(c)      *Voting*:  Class 4 is Impaired.  The Holders of the Allowed Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

## B.   Disputed Claims

No Distribution will be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount and nature of such an Allowed Claim is determined by a Final Order, by a stipulation between USEY and the Holder of the Claim that is executed prior to the Effective Date and that has been approved by the Bankruptcy Court, or by a stipulation between the Plan Administrator

and the Holder of the Claim that is executed after the Effective Date. No Distribution will be made on account of a Disallowed Claim at any time.

## C.     **Means for Implementation of the Plan**

### 1.  Plan Administrator

The Plan contemplates the appointment of the Plan Administrator on the Effective Date to administer certain post-Effective Date responsibilities and exercise post-Effective Date rights under the Plan and the Plan Administrator Agreement. The powers, authority, responsibilities and duties of the Plan Administrator are set forth in and will be governed by the Plan and the Plan Administrator Agreement, in substantially the form annexed as an exhibit to the Plan. After the Effective Date, the Plan Administrator, *inter alia*, will be the representative of the Creditors, responsible for making Distributions to Holders of Allowed Claims in accordance with the terms of the Plan, and responsible for winding-down the USEY Estate.

### 2.  Sources of Funding for the Plan

The Plan provides for the Distribution of all funds in the USEY Estate to Creditors in accordance with the priority scheme set forth in the Bankruptcy Code. Funds for Distribution come from the following sources: (i) Cash on hand that consists primarily of the remaining proceeds realized from the settlement of the Avoidance Claims, the sale of the Plymouth Shares, and the sale of the USEY Sale Assets, (ii) the remaining balance of the purchase price for the Plymouth Shares that will be paid to the Debtor contemporaneously with Silver Point's payment of the Silver Point Administrative Claims Obligation, and (iii) the Silver Point Administrative Claims Obligation. The Silver Point Administrative Claims Obligation, in turn, has three components: (a) the obligation to pay Allowed Administrative Claims that are unpaid as of the Effective Date and Disputed Administrative Claims that become Allowed Claims subsequent to the Effective Date, (b) the obligation to reimburse the Debtor for Allowed Administrative Claims that have already been paid by the Debtor with Cash that otherwise would be available to make Distributions to Holders of Allowed Priority Claims and Holders of Allowed General Unsecured Claims, and (c) the obligation to pay allowed administrative expenses of the USEB Debtors. Annexed hereto as **Exhibit C** is a detailed calculation of the remaining balance of the Silver Point Administrative Claims Obligation.

Annexed hereto as **Exhibit B** is the Debtor's Sources and Uses of Cash Analysis that contains a breakdown of the sources of Cash that will be used to fund the post-Effective Date winding-down of the USEY Estate as well as Distributions to Holders of Allowed Priority Claims and Holders of Allowed General Unsecured Claims. The Sources and Uses of Cash Analysis also contains a breakdown of the Allowed Administrative Claims of the USEY Estate and the allowed administrative claims of the USEB Debtors that are payable out of the Silver Point Administrative Claims Obligation.

### 3.  Investments

All Cash held by the Plan Administrator will be invested (a) in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and (b) as deemed appropriate by the Plan Administrator.

4.   Disposition of Assets

Subject to the provisions of Article VI of the Plan, all Assets not previously disposed of will be sold or otherwise liquidated or, if appropriate in the judgment of the Plan Administrator, abandoned in any commercially reasonable manner, including to a charitable organization or organizations designated by the Plan Administrator in respect of Assets of inconsequential value.

5.   Distributions

The Plan Administrator will be solely responsible for making Distributions out of the Plan Fund and the Unsecured Distribution Fund to all Holders of Allowed Claims that do not receive payment in full on or before the Effective Date. All Cash and other property held by the Plan Administrator for Distribution will be held in trust for the exclusive benefit of Holders of Allowed Claims and will not be subject to any claim by any Person or Entity except as provided in the Plan and/or the Plan Administrator Agreement. All Distributions to Holders of Allowed Claims are solely payable out of the Plan Fund and the Unsecured Distribution Fund pursuant to the terms of the Plan.

6.   Closing of the Plan Fund and Establishment of the Unsecured Distribution Fund

When all Distributions have been made out of the Plan Fund to Holders of Allowed Administrative Claims, Allowed Priority Claims and Allowed Secured Claims, the remaining Cash in the Plan Fund will be used by the Plan Administrator to fund the Unsecured Distribution Fund.

7.   Release of Liens

On or before the Effective Date, any Person or Entity will execute and file such document, notice or public statement as is reasonably necessary or appropriate under applicable law in the relevant jurisdictions to evidence and effect the termination of the Liens formerly held by such parties or any Liens held in favor of such Person or Entity in respect of the Assets. In addition, the Plan Administrator will be appointed as an attorney-in-fact under the laws of the United States of America for each party whose Lien is terminated pursuant to the Plan, with full power and authority to execute on behalf of such party any notices or other public statements as are necessary or appropriate to evidence the termination of such party's Lien and any financing statement relating to any and all security interests in the Assets.

8.   Liability of the Plan Administrator

The Plan Administrator may rely, and will be fully protected in acting or refraining from acting if the Plan Administrator relies, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Plan Administrator reasonably believes to be genuine and to have been signed or presented by the party or parties properly authorized to do so or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties, and the Plan Administrator may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein. The Plan Administrator may consult with counsel and other professionals with respect to matters in their

area of expertise, and any advice of counsel will be full and complete authorization and protection in respect of any action taken or not taken by the Plan Administrator. The Plan Administrator will be entitled to rely upon the advice of such professionals in acting or failing to act, and will not be liable for any act taken or not taken in reliance thereon. The Plan Administrator will have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning the Plan Administrator Agreement, the Plan or any other document executed in connection therewith, and the Plan Administrator will be entitled to rely upon such instructions in acting or failing to act and will not be liable for any act taken or not taken in reliance thereon.

Persons and Entities dealing with the Plan Administrator will look only to the Assets, the Plan Fund and the Unsecured Distribution Fund to satisfy any liability incurred by the Plan Administrator to such Person or Entity in carrying out the terms of the Plan Administrator Agreement and the Plan, and the Plan Administrator will have no personal obligation to satisfy any such liability, except to the extent such liability or obligation is determined by Final Order to have arisen as a result of gross negligence, willful misconduct, fraud or criminal conduct of the Plan Administrator in which case the Assets, the Plan Fund and the Unsecured Distribution Fund will not be subject to such claims or liabilities.

9. <u>Exculpation and Indemnification of the Plan Administrator Exculpated Parties</u>

From and after the Effective Date, the Plan Administrator, the Plan Administrator's employees, independent contractors, professionals, agents and representatives (collectively, the "<u>Plan Administrator Exculpated Parties</u>") will be exculpated by all Persons and Entities including without limitation Holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Plan Administrator by the Plan Administrator Agreement, the Plan or any Final Order entered pursuant to or in furtherance of the Plan or the Plan Administrator Agreement, or applicable law or otherwise, except only for actions or omissions to act only to the extent determined by Final Order to be due to the respective Plan Administrator Exculpated Parties' gross negligence, willful conduct, fraud or criminal conduct after the Effective Date. No Claim Holder or any other party in interest will have or be permitted to pursue any claim or cause of action against the Plan Administrator Exculpated Parties for making Distributions or for implementing the provisions of the Plan and the Plan Administrator Agreement except in cases of gross negligence, willful misconduct, fraud or criminal conduct as determined by Final Order. The Plan Administrator will indemnify, defend and hold harmless the Plan Administrator Exculpated Parties from and against any claims, causes of action, liabilities, obligations, damages or expenses, including attorneys' fees and costs (unless determined by Final Order to be due to the respective Plan Administrator Exculpated Parties' own gross negligence, willful misconduct, fraud or criminal conduct after the Effective Date), to the fullest extent permitted by applicable law. Any action taken or act omitted to be taken with the approval of the Bankruptcy Court will conclusively be deemed not to constitute gross negligence, willful misconduct, fraud or criminal conduct.

### 10. Elimination of Classes

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim, or a Claim temporarily Allowed under Bankruptcy Rule 3018, will be deemed deleted from the Plan for the purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 11. Indemnification of Directors, Officers and Employees of USEY

The obligations of USEY to indemnify any Person serving at any time on or prior to the Effective Date as one of its directors, officers or employees by reason of such Person's service in such capacity, or as a director, an officer, a partner, a trustee, an employee or an agent of USEY to the extent provided in USEY's constituent documents, by a written agreement with USEY or applicable state law, each as applicable, will be deemed and treated as executory contracts that are assumed by USEY pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive unimpaired and unaffected by the Confirmation Order, irrespective of whether such indemnification is owed for an act or an event occurring before or after the Petition Date, except if such claim or liability is determined by a Final Order to have resulted from gross negligence, willful misconduct, fraud or criminal conduct of such indemnified Person.

### 12. Insurance Preservation

Nothing in the Plan, including any releases, will diminish or impair the enforceability of the insurance policies of USEY that may cover any Claims against USEY or any other Person or Entity.

### 13. Cancellation of Existing Agreements and Securities

Except for the purposes of evidencing a right to receive a Distribution under the Plan or as otherwise provided thereunder, on the Effective Date, all the agreements or other documents evidencing any Claims or rights of any Holder of a Claim against USEY, including all indentures, credit agreements, security agreements and notes evidencing such Claims, and any Interests, options or warrants (regardless of whether exercised) to purchase Interests, will be deemed cancelled, surrendered to USEY, and of no further force or effect. On the Effective Date of the Plan, USEY will be deemed to have no authorized Interests.

### 14. Dissolution of USEY

As of the Effective Date, the existing officers and directors of USEY will cease to serve in their current capacities. The terms of the board of directors of USEY will be deemed to expire and the positions of each officer of USEY will terminate on the Effective Date. The Plan Administrator will succeed to the right to act in such capacities as may be necessary to implement the Plan. The Plan Administrator will prepare or cause to be prepared and filed on behalf of USEY the final tax returns and will pay any taxes due with respect to the final tax returns consistent with the terms of the Plan and the Plan Administrator Agreement. After the final tax returns have been prepared and filed and any taxes due with respect to the final tax

returns have been paid, the Plan Administrator will cause to be prepared and filed on behalf of USEY a certificate of dissolution with the Office of the Secretary of State of Delaware. As soon as reasonably practicable after the Effective Date, the Plan Administrator will also cause to be prepared and filed a Form 15 certifying to and notifying the United States Securities and Exchange Commission of the termination of the registration under the Exchange Act of 1934 of the Interests. The Plan Administrator will pay all reasonable costs and expenses in connection with the dissolution of USEY and the termination of the registration under the Exchange Act of 1934 of its Interests, including the costs of preparing and filing any necessary paperwork or documentation, out of the Plan Fund and the Unsecured Distribution Fund. After the Effective Date, USEY will have no authorization to implement the provisions of the Plan.

### 15. Terms of Injunctions and Stays

Unless otherwise provided in the Plan or an applicable order of the Bankruptcy Court, all injunctions or stays provided in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code will remain in full force and effect until the Effective Date.

### 16. Payment of Statutory Fees

On the Effective Date, and thereafter, as may be required until the entry of a Final Decree, USEY or the Plan Administrator, as the case may be, will pay all fees payable pursuant to section 1930 of Title 28 of the United States Code (the "UST Fees"). The UST Fees are solely payable out of the Plan Fund and the Unsecured Distribution Fund. In addition, the Plan Administrator will file post-confirmation quarterly repots in conformity with the U.S. Trustee guidelines until entry of a Final Decree.

### 17. Revocation and Withdrawal of the Plan

USEY reserves the right to revoke or withdraw the Plan at any time before entry of the Confirmation Order. If USEY revokes or withdraws the Plan prior to the Confirmation Hearing, or if Confirmation of the Plan or the Effective Date does not occur, then the Plan will be deemed to be null and void as to the USEY Estate. In such an event, nothing contained in the Plan or in any document relating to the Plan will be deemed to constitute an admission of validity, waiver or release of any Claims by or against USEY or any Person or any Entity or to prejudice in any manner the rights of USEY or any Person or any Entity in any proceeding involving USEY.

### 18. Compliance with Tax Requirements

In connection with the Plan, to the extent required by law, USEY, the Plan Administrator or any agent thereof making Distributions will deduct any federal, state or local withholding taxes from Distributions and will remit such taxes to the appropriate Governmental Unit on a timely basis. All Holders of Allowed Claims will be required to provide any information reasonably requested in writing to effect the withholding of such taxes, and USEY, the Plan Administrator or any disbursement agent thereof may withhold any Distribution absent the provision of such information or further order of the Bankruptcy Court. USEY, the Plan Administrator or any agent thereof will reasonably cooperate with Claim Holders in demonstrating an exemption from any applicable withholding taxes. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirement of

any Governmental Unit within sixty (60) days after the date of the first written notification by USEY, the Plan Administrator or any disbursement agent to the Holder of the Claim of the need for such information, then such Claim Holder's Distribution will be treated as an unclaimed Distribution in accordance with section 6.5 of the Plan.

### 19. De Minimis Distribution Provisions

Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator will not be required to distribute, and will not distribute, Cash to the Holder of an Allowed Claim if the amount of Cash to be distributed on account of such Claim is less than $50.00. Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $50.00 will have such Claim disallowed and released and will be forever barred from asserting any such Claim against USEY, the Plan Administrator or any of their respective property. Any Cash not distributed pursuant to section 6.6 of the Plan will be placed in the Unsecured Distribution Fund, free of any restrictions thereon, pending a final Distribution or disposition pursuant to the terms of the Plan.

### 20. Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale or assignments executed in connection with the disposition of the Assets contemplated by the Plan (including real and personal property) will not be subject to any stamp, real estate transfer, mortgage recording sales, use or similar tax.

## D. Release, Injunctive and Related Provisions

### 1. Releases

**In consideration of the contributions of certain parties to the Chapter 11 Case, Article IX of the Plan provides for certain waivers, exculpations, releases and injunctions.**

> a. ***Releases by the Debtor and the Plan Administrator as the successor to the Debtor under the Plan.*** *Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration including but not limited to the service of the D&O Released Parties in facilitating the reorganization of the Debtor, each of the Debtor and the Plan Administrator as the successor to the Debtor under the Plan will irrevocably and absolutely releases all D&O Released Parties from any and all Claims and Causes of Actions that the Debtor or the Plan Administrator would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity or Person, based in whole or in part upon any act of omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtor, the Plan Administrator or the*

*Chapter 11 Case; provided, however, that there will be no such release on account of Claims or liabilities in respect of any contractual obligation owed by such Entity or Person to the Debtor or the Plan Administrator; provided, further, that there will be no effect on the liability of any of the D&O Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a Final Order.*

        b.   **Releases by Holders of Claims.**  *Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for their Distributions, each Holder of a Class 3 General Unsecured Claim who (i) has voted to accept the Plan or abstained from voting and (ii) has not opted out from the release provided in the Plan will be deemed to have released irrevocably and absolutely each of the D&O Released Parties from any and all claims or causes of action based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtor, the Plan Administrator or the Chapter 11 Case; provided, however, that there will be no effect on the liability of the D&O Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a Final Order.*

### 2. Exculpation

*The Debtor, the Plan Administrator, the D&O Released Parties and each of the foregoing Entities' or Persons' respective members, partners, officers, directors, employees and agents (including any attorneys, accountants, financial advisors, investment bankers and other representatives or professionals retained by such Entities or Persons) (collectively, the "Exculpated Parties"), and the property of each of the foregoing Entities or Persons will not have and will not incur liability to any Holder of a Claim or Interest for any action or omission arising out of or in connection with the Debtor's restructuring or the Chapter 11 Case, including without limitation the commencement of the Chapter 11 Case, the negotiation, execution and performance of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of Confirmation of the Plan, the Effective Date of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the foregoing will have no effect on the liability of any of the Exculpated Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a Final Order (collectively, the "Exculpated Acts"). The Exculpated Parties by section 9.2 of the Plan will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under and in connection with the Plan.*

*The Plan Administrator will, from and after the Effective Date, indemnify, hold harmless and reimburse (on an as-incurred basis) each of the Exculpated Parties and the property of each of the Exculpated Parties, from, against and for any and all losses, claims, damages, liabilities, costs and/or expenses (collectively, the "Damages") arising from, related to or that are in any manner connected with any Exculpated Act, including without limitation, any Damages arising*

*or resulting from or that are in any manner connected with (i) any cause of action, suit, investigation or any other proceeding and (ii) the defense of any Exculpated Person (or the involvement or participation of any Exculpated Person) in any cause of action, suit, investigation or any other proceeding.*

### 3. Injunction

*Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or exculpated pursuant to the Plan, including without limitation the claims and causes of action released in sections 9.1 and 9.2 of the Plan.*

### 4. Discharge

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation of the Plan will not discharge any of the Claims against USEY; provided, however, that no Claim Holder may on account of such Claim seek to receive any payment or other treatment from, or seek recourse against USEY or the Plan Administrator or their respective property, except as expressly provided in the Plan.

## E. Retention of Jurisdiction

### 1. General Scope of Retention of Jurisdiction

Article X of the Plan provides that notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Plan Administrator Agreement, the Confirmation Order and the Chapter 11 Case to the fullest extent permitted by law, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

### 2. Claims and Actions

Article X of the Plan provides that the Bankruptcy Court will retain jurisdiction (a) to classify, resolve objections to, determine the allowance or disallowance, or estimate pursuant to section 502(c) of the Bankruptcy Code all Claims against, and Interests in, USEY and (b) to adjudicate and enforce all Causes of Action owned by USEY or the Plan Administrator.

### 3. Specific Jurisdiction

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over the Chapter 11 Case as otherwise set forth herein, Article X of the Plan provides that the Bankruptcy Court will retain jurisdiction for the following specific purposes:

a.           to hear and determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any executory

contract and to hear and determine, and, if need be, the allowance or disallowance of Claims resulting therefrom;

b.          to hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter arising in or related to the Chapter 11 Case pending on or commenced after the Confirmation Date;

c.          to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

d.          to hear and determine objections to Claims, including ruling on any and all motions to estimate Claims that are Filed pursuant to Article VI of the Plan;

e.          to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

f.          to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

g.          to enter and enforce any order for the sale of Assets pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

h.          to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

i.          to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

j.          to hear and determine any and all applications for allowances and payment of Professional Fees and the reasonableness of any Professional Fees authorized to be paid or reimbursed under the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

k.          to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Administrator Agreement, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

l.          to take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or maintain the integrity of the Plan following consummation of the Plan;

m.　　　　　to hear and determine other matters and for such other purposes as may be provided in the Confirmation Order;

n.　　　　　to hear and determine all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code Filed, or to be Filed, with respect to tax returns for any and all applicable periods);

o.　　　　　to issue such orders in aid of execution of the Plan as may be authorized by section 1142 of the Bankruptcy Code;

p.　　　　　to adjudicate all claims or controversies to a security or ownership interest in the Assets or in any proceeds thereof;

q.　　　　　to resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan and to enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

r.　　　　　to consider and act on the compromise and settlement of any Claim against or Cause of Action by or against USEY arising under or in connection with the Plan;

s.　　　　　to determine such other matters or proceedings as may be provided for under the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or in any order or orders of the Bankruptcy Court, including but not limited to the Confirmation Order or any order which may arise in connection with the Plan or the Confirmation Order;

t.　　　　　to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code;

u.　　　　　to recover all Assets, wherever located; and

v.　　　　　to enter a Final Decree closing the Chapter 11 Case.

### 4.　Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Case, including the matters set forth in Article X of the Plan, Article X of the Plan will not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## VI.　CONFIRMATION OF THE PLAN

### A.　Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court after notice, hold a hearing on confirmation of a plan of reorganization (the "Confirmation Hearing").

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for ___ ___,**October 5,** 2010 at __:___ **10:00 a**.m. (prevailing Eastern Time), before the Honorable Robert D. Drain, United States Bankruptcy Judge, in the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for any announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on or before ___ ___,**September 24,** 2010 at __5:__00 p.m. (prevailing Eastern Time) in accordance with the Notice accompanying this Disclosure Statement.

> **UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B.     Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  If so, the Bankruptcy Court will enter the Confirmation Order.   USEY believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in connection with the Chapter 11 Case has been disclosed to the Bankruptcy Court and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to Bankruptcy Court approval.

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or an Interest in such Class has accepted the Plan or each such Holder will receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims and

Allowed Priority Non-Tax Claims will be paid in full (i) on the Effective Date or as soon thereafter as practicable, or (ii) on the date on which such Claim would have been due and payable if the Chapter 11 Case had not been commenced.

- Except to the extent that the Holder of a particular Allowed Priority Tax Claim agrees to a different treatment, the Plan provides that Allowed Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

- At least one Class of Impaired Claims (not including any acceptance of the Plan by any Insider (as defined in section 101(31) of the Bankruptcy Code) holding a Claim in such Class has accepted the Plan.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of USEY under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee will be paid as of the Effective Date.

USEY believes that (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

1.    Best Interests of Creditor Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or Interest in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if USEY was liquidated under chapter 7 of the Bankruptcy Code.  In other words, if an Impaired Class does not unanimously accept the Plan, then the Bankruptcy Court must determine that it is in the "best interests" of each Holder of an Allowed Claim or Interest that did not vote to accept the Plan.

In chapter 7 liquidation cases, unsecured creditors and equity security holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have been paid in full or payment has been provided for:

- Secured creditors (to the extent of the value of their collateral).

- Priority creditors.

- Unsecured creditors.

- Debt expressly subordinated by its terms or by an order of the Bankruptcy Court.

- Equity security holders.

USEY has proposed a liquidating plan. In any event, whether by USEY or a chapter 7 trustee, as the case may be, the Assets will be liquidated. Accordingly, there is no reorganization value to be calculated, or distribution scenarios related thereto. In addition, the activities of the Plan Administrator after the Effective Date of the Plan are the very same ones that would be pursued by a chapter 7 trustee. However, unlike a chapter 7 trustee who may seek to charge statutory fees of up to 3% of the disbursements, the Plan Administrator will be compensated at a fixed annual rate. It is also possible that a distribution of the proceeds of the liquidation of the Assets could be delayed for a period of time in order for a chapter 7 trustee and its professionals to become knowledgeable about the Chapter 11 Case and the Claims against USEY.

After careful review of the estimated recoveries of a chapter 11 liquidation scenario and a chapter 7 liquidation scenario, USEY has concluded that recoveries to Creditors will be maximized by the transactions contemplated under the Plan, completing the liquidation of the Assets under chapter 11 of the Bankruptcy Code in accordance with the priority scheme set forth in the Bankruptcy Code and making distributions and payments pursuant to the Plan. USEY believes that the USEY Estate has value that would not be fully realized by Creditors in a chapter 7 liquidation primarily because (i) additional administrative expenses would be incurred in a chapter 7 liquidation in accordance with the priority scheme set forth in the Bankruptcy Code, specifically those of a chapter 7 trustee charging statutory fees of up to 3% of disbursements and the cost of the chapter 7 trustee's professionals, all of whom would need to spend many hours reviewing, understanding and duplicating the lengthy investigation of the facts and circumstances of the Chapter 11 Case and the Claims against USEY already undertaken by the Debtor and its professionals; and (ii) the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions.

The Plan offers the advantage to Creditors that they will likely receive more than they would receive in a chapter 7 liquidation case. The Plan contemplates the creation of a Plan Administrator who will proceed with the administration of the Assets without the additional time and expense that would be imposed by conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. A conversion to a case under chapter 7 of the Bankruptcy Code at this point would only serve to delay the orderly process already in place and lower the amount of Distributions to Holders of Allowed Claims.

Thus, the Debtor believes the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code because under the Plan all Holders of Impaired Claims or Interests will receive Distributions, if any, that have a value that is not less than the value of the distribution, if any, that each such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

2.    Plan Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the

Debtor or any successor to the Debtor under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan. The Plan proposed by USEY provides for a liquidation of the Assets and a distribution of the Cash proceeds to Creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The Debtor will not be conducting any business operations after the Effective Date of the Plan and the ability to make Distributions according to the terms of the Plan does not depend on future earnings or operations of the Debtor.

As demonstrated by the Sources and Uses of Cash Analysis that is annexed hereto as **Exhibit B** and the calculation of the remaining balance of the Silver Point Administrative Claims Obligation that is annexed hereto as **Exhibit C**, the Cash expected to be on hand in the USEY Estate on the Effective Date and Silver Point's obligation under the Asset Purchase Agreement to pay the remaining balance of the Silver Point Administrative Claims Obligation should provide the Debtor with more than sufficient funds to make all payments due under the Plan on the Effective Date, including without limitation the Distributions to the Holders of Allowed Administrative Claims and Holders of Allowed Priority Claims. Moreover, as shown by the projections contained in the Sources and Uses of Cash Analysis and the calculation of the remaining balance of the Silver Point Administrative Claims Obligation that are respectively annexed hereto as **Exhibits B** and **C**, the Debtor estimates that the Plan Administrator will have sufficient Cash in the Unsecured Distribution Fund, on the Unsecured Distribution Date, to make a Distribution in the aggregate amount of $635,534.52 to Holders of Allowed General Unsecured Claims. Accordingly, the Debtor believes that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

3.     Bankruptcy Code Section 1129(b): Unfair Discrimination and the "Fair and Equitable Test"

USEY will request the Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by an Impaired Class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such Class. USEY has reserved the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

(a)                 No Unfair Discrimination

The "unfair discrimination" test applies to two or more Impaired Classes of Claims or Interests that are of equal priority and are receiving disparate treatment under the Plan. The test does not require that the treatment of such Classes be the same or equivalent, but only that the treatment be "fair." The Plan does not classify separately claims against, or interests in, USEY, into two or more Impaired Classes of equal priority. Since all Impaired Claims or Interests of equal rank are classified in the same Class and are treated equally, there is no basis for any Holder of an Impaired Claim or Interest to assert that the Plan unfairly discriminates. Simply put, the Plan satisfies the "unfair discrimination test" because the Plan does not discriminate at all, therefore, it cannot do so unfairly.

        (b)                       Fair and Equitable Test: "Cramdown"

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes a "cramdown" test for dissenting classes of secured creditors, unsecured creditors and equity security holders. As to each dissenting class, the test prescribes different standards depending on the types of claims or equity security interests in such class.

*Secured Creditors*. With respect to each class of secured creditors that rejects the plan, the plan must provide (a)(i) that each holder (the "Secured Creditor") of a claim in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such secured claim and (ii) that the Secured Creditor receives on account of its secured claim deferred cash payments having a value, as of the effective date of the plan, of at least the value of the allowed amount of such secured claim; (b) for the sale of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds under clause (a) or (c) of this subparagraph; or (c) for the realization by the Secured Creditor of the "indubitable equivalent" of its secured claim.

*Unsecured Creditors*. With respect to each impaired class of unsecured claims that rejects the plan, the plan must provide (a) that each holder of a claim in the rejecting class will receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that no holder of a claim or interest that is junior to the claims of such rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

*Equity Security Holders*. With respect to each impaired class of interests that rejects the plan, the plan must provide (a) that each holder of an equity security interest included in the rejecting class receive or retain on account of that equity security interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or (b) that no holder of an equity security interest that is junior to such equity security interests will receive or retain under the plan any property on account of such junior interest.

The Holders of Allowed Interests in Class 4 will not receive or retain any property under the Plan on account of their respective Allowed Interests in Class 4. Accordingly, under section 1126(g) of the Bankruptcy Code, Class 4 is presumed to have rejected the Plan. USEY (a) intends to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of Class 4, and (b) reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by any Class of Claims.

USEY believes that the Plan may be confirmed pursuant to the above-described "cramdown" provisions, over the dissent of the Holders of Allowed Class 4 Interests, in view of the treatment proposed for such Class. USEY believes that the treatment provided under the

Plan for Holders of Allowed Interests in Class 4 will satisfy the "fair and equitable" test because, although no Distribution will be made in respect of Interests in such Class and, as a result, such Class will be deemed to have rejected the Plan, no Holders junior to such non-accepting Class will receive or retain any property under the Plan. Additionally, as noted above, USEY does not believe that the Plan unfairly discriminates against any dissenting Class because all Claims or Interests of equal rank are classified in the same Class and are treated equally.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

> **NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE ("IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO USEY OR HOLDERS OF CLAIMS OR INTERESTS, AND EACH SUCH HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

### A. Federal Income Tax Consequences of the Plan to USEY

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to USEY and the Holders of Claims and Interests. This summary is based upon the Internal Revenue Code of 1986 (as amended, the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtor.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

#### 1. IRS Circular 230 Disclosure

> **TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTOR INFORMS YOU THAT (A) ANY UNITED STATES FEDERAL TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS OR DISCLOSURES) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON OR ENTITY FOR THE**

PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND (C) ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES ~~FORM~~FROM AN INDEPENDENT TAX ADVISOR.

2.   <u>Federal Income Tax Consequences to the Debtor</u>

When debt is cancelled, a debtor may realize cancellation of debt income ("<u>COD</u>"). COD is the amount by which the discharged indebtedness (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction).  A debtor will not, however, be required to include any COD in its gross income if the debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to such proceeding.  Instead, the Tax Code provides that a debtor in a bankruptcy proceeding must, subject to certain limitations, reduce its tax attributes (including, but not limited to, net operating loss ("<u>NOL</u>") carryforwards, current year NOLs, tax credits, and tax basis in assets) by the amount of  the COD.  To the extent the amount of COD exceeds the tax attributes available for reduction, any remaining COD is discharged with no further tax cost to the debtor.

In the context of a consolidated group of corporations, current law generally provides for a complex ordering formula in determining how the tax attributes of one member can be reduced by the COD of another member.  Any reduction in tax attributes does not occur until after the determination of tax liability for the taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the debt is discharged.  USEY and the other Debtors that are members of its consolidated tax group may be entitled to elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes if such an election is advantageous.

To the extent that recourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the fair market value of such property over the debtor's basis in such property, with any balance of the debt in excess of the fair market value of the property (less any other consideration paid to discharge such debt) treated as COD.  By contrast, to the extent that nonrecourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the nonrecourse debt balance over the debtor's tax basis in such property, as opposed to COD.  The Debtor does not anticipate that it will recognize gain that is taxable as ordinary income for U.S. federal income tax purposes.

**B.**         <u>Federal Income Tax Consequences of the Plan to Holders of Claims and Interests</u>

> **THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

A Holder of an Allowed Claim will generally recognize income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on the Claim but was not previously included in income by the Holder of the Allowed Claim. A Holder of an Allowed Claim or Allowed Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in the Claim or the Interest and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will be equal the sum of Cash and fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder, the nature of the Claim or Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt reduction with respect to the Claim, and the Holder's holding period of the Claim or Interest. If the Claim or Interest possessed by the Holder is a capital asset, the gain or loss realized will be generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder is a non-corporate taxpayer and held such Claim or Interest for longer than one year or short-term capital gain or loss if the Holder held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Allowed Interest who receives, in respect of its Claim or Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction.

Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to their gross income on a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Whether a Holder of Claims or Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to

the nature of the Holder and its Claims or Interests. Accordingly, Holders of Claims and Interests should consult their own tax advisors.

USEY or the Plan Administrator, as applicable, will withhold Distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding." Backup withholding generally applies if the holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

If any party fails to provide USEY or the Plan Administrator with a requested TIN within sixty (60) days of that request, such failure will be deemed a waiver of rights to Distributions under the Plan. Proceeds that would have been distributed to such a party will be distributed to the other parties based upon their pro rata beneficial interests.

## VIII.   CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

### A.        Failure to Confirm the Plan

Even if the Impaired Class of Claims accepts or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of the Plan and requires, among other things, (a) that confirmation of the Plan not be followed by liquidation or a need for further financial reorganization, unless the Plan provides for such liquidation or a need for further financial reorganization, (b) that the value of distributions to dissenting Holders not be less than the value of distributions to such Holders if the Debtor was liquidated under chapter 7 of the Bankruptcy Code and (c) the Plan and the Debtor as the plan proponent otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtor believes that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.        Delays of Confirmation or the Effective Date

Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased administrative costs, including Professional Fee Claims. These negative effects of delay of either Confirmation or the Effective Date could endanger the ability of the Debtor to consummate the Plan and emerge from bankruptcy protection.

### C.        Risks of Successfully Creating Value

The potential to have more than a nominal Distribution to Holders of Allowed General Unsecured Claims, if any Distribution at all, is dependant largely on the success of the Debtor and the Plan Administrator, as applicable, in controlling the costs of winding down the USEY Estate. The Debtor cannot state with any certainty the likely outcome of the Debtor's and the Plan Administrator's efforts to create value for Creditors.

**D.**        <u>Claim Estimates</u>

There can be no assurances that the estimated Claim amounts set forth in this Disclosure Statement or the exhibits hereto are correct. The actual Allowed amount of the Claims may differ substantially from the estimates. The estimated Allowed amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should one or more of the underlying assumptions prove incorrect, the actual Allowed amount of the Claims may significantly vary from those estimated herein.

Indeed, if the assumption that the First Lien Agent and the Second Lien Agent will voluntarily withdraw their proofs of claim with prejudice prior to the Confirmation Hearing proves to be incorrect, the actual Allowed amount of General Unsecured Claims will increase exponentially and the Distributions to Holders of Allowed Genera Unsecured Claims will be dramatically diluted. There is no guarantee that the Debtor or the Plan Administrator will be successful in disallowing and expunging the proofs of claim filed by the First Lien Agent and the Second Lien Agent. Any funds expended by the Debtor or the Plan Administrator in prosecuting the disallowance and expungement of the proofs of claim filed by the First Lien Agent and the Second Lien Agent will dilute Distributions to Holders of Allowed Claims regardless of whether such proofs of claim are disallowed and expunged.

**E.**        <u>Silver Point Could Fail to Fund the Silver Point Administrative Claims Obligation</u>

While the Debtor is confident that Silver Point will fund the Silver Point Administrative Claims Obligation, a failure to fund the Silver Point Administrative Claims Obligation would result in the Debtor being unable to pay Allowed Administrative Claims in full and there being no funds available for Distribution to other Creditors. Accordingly, in the event Silver Point were to dishonor the Silver Point Administrative Claims Obligation, the Effective Date likely would not occur, and the Plan likely would not become substantially consummated, unless and until litigation against Silver Point to enforce the Silver Point Administrative Claims Obligation were commenced and resolved in favor of the Debtor.

**F.**        <u>Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate</u>

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Debtor. These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These statements are based on the beliefs of management as well as assumptions made using information currently available to management. Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by management. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements do not guarantee future performance.

You should recognize these statements for what they are and not rely on them as facts. The Debtor does not undertake any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

## IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan provides Creditors with the greatest possible recoveries on their Allowed Claims. If the Plan is not confirmed or consummated, the alternatives include, (i) confirmation of an alternative liquidating plan submitted by the Debtor or another party in interest, (ii) liquidation of the Debtor under chapter 7 of the Bankruptcy Code, or (iii) dismissal of the Chapter 11 Case. As set forth in the Debtor's analysis in Article VI.B.1, the Debtor believes that the Plan provides a greater recover to Holders of Allowed Claims than would be achieved in chapter 7. Therefore, a case under chapter 7 of the Bankruptcy Code is not a superior alternative to the Plan. The Debtor does not believe that any alternative plan or dismissal of the Chapter 11 Case would provide greater recoveries to Holders of Allowed Claims.

The Debtor believes that confirmation and implementation of the Plan are preferable to any of the above-described alternatives and recommends that all Creditors entitled to vote, do so in favor of the Plan.

## X. CONCLUSION

USEY believes that acceptance of the Plan is in the best interest of Creditors and recommends that you vote to accept the Plan.

**U.S. ENERGY SYSTEMS, INC.**


By:  _____*/s/ Richard Augustine*_____
        Name:  Richard Augustine
        Title:  Chief Accounting Officer

45

Document comparison done by Workshare DeltaView on Tuesday, August 10, 2010 6:03:24 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://EMF_US/HW_US/27665973/8 |
| Document 2 | interwovenSite://EMF_US/HW_US/27665973/9 |
| Rendering set | H&W |

| Legend: |
|---|
| **<u>Insertion</u>** |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 15 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 29 |